IN THE SUPREME COURT OF NORTH CAROLINA

No. 179A14-3

Filed 16 August 2019

STATE OF NORTH CAROLINA

v.

TORREY GRADY

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 817 S.E.2d 18 (N.C. Ct. App. 2018), reversing an order for satellite-based monitoring entered on 26 August 2016 by Judge Phyllis M. Gorham in Superior Court, New Hanover County. Heard in the Supreme Court on 8 January 2019.

> *Joshua H. Stein, Attorney General, by Teresa M. Postell, Assistant Attorney General, and Joseph Finarelli, Special Deputy Attorney General, for the State-appellant.*
>
> *Glenn Gerding, Appellate Defender, and Lewis Everett for defendant-appellee.*
>
> *Christopher Brook for American Civil Liberties Union of North Carolina Legal Foundation; and Nathan Freed Wessler, pro hac vice, and Brandon J. Buskey, pro hac vice, for American Civil Liberties Union Foundation, amici curiae.*

EARLS, Justice.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. The United States Supreme Court has determined that North Carolina's satellite-based monitoring (SBM) of sex offenders,

which involves attaching an ankle monitor "to a person's body, without consent, for

the purpose of tracking that individual's movements," constitutes a search within the

meaning of the Fourth Amendment. *Grady v. North Carolina*, 135 S. Ct. 1368, 1370

(2015) (per curiam). The Supreme Court remanded the case for an examination of

"whether the State's monitoring program is reasonable—when properly viewed as a

search." *Id.* at 1371. In its per curiam opinion, the Supreme Court noted, among

other things, the following:

> The State's program is plainly designed to obtain
> information. And since it does so by physically intruding
> on a subject's body, it effects a Fourth Amendment search.
>
> That conclusion, however, does not decide the
> ultimate question of the program's constitutionality. The
> Fourth Amendment prohibits only *unreasonable* searches.
> The reasonableness of a search depends on the totality of
> the circumstances, including the nature and purpose of the
> search and the extent to which the search intrudes upon
> reasonable privacy expectations. *See, e.g.*, *Samson v.
> California*, 547 U.S. 843 (2006) (suspicionless search of
> parolee was reasonable); *Vernonia School Dist. 47J v.
> Acton*, 515 U.S. 646 (1995) (random drug testing of student
> athletes was reasonable). The North Carolina courts did
> not examine whether the State's monitoring program is
> reasonable—when properly viewed as a search—and we
> will not do so in the first instance.

*Id.* (citations omitted). In accordance with this decision, this case was ultimately

remanded to the superior court, which entered an order determining the SBM

program to be constitutional. The Court of Appeals reversed, but only as to Mr. Grady

individually. We conclude that the Court of Appeals erroneously limited its holding

to the constitutionality of the program as applied only to Mr. Grady, when our analysis of the reasonableness of the search applies equally to anyone in Mr. Grady's circumstances. *Cf. Graham v. Florida*, 560 U.S. 48, 82 (2010) (holding that state statutes mandating a sentence of life imprisonment without the possibility of parole are unconstitutional as applied to a specific group, namely juveniles who did not commit homicide).

In North Carolina, "SBM's enrollment population consists of (1) offenders on parole or probation who are subject to State supervision, (2) unsupervised offenders who remain under SBM by court order for a designated number of months or years, and (3) unsupervised offenders subject to SBM for life, who are also known as 'lifetime trackers.'" *State v. Bowditch*, 364 N.C. 335, 338, 700 S.E.2d 1, 3 (2010). Mr. Grady is in the third of these categories in that he is subject to SBM for life and is unsupervised by the State through probation, parole, or post-release supervision. Additionally, Mr. Grady is a "recidivist," which makes lifetime SBM mandatory as to him without any individualized determination of the reasonableness of this search. Because we conclude that the relevant portions of N.C.G.S. §§ 14-208.40A(c) and 14-208.40B(c) are unconstitutional as applied to all individuals who, like Mr. Grady, are in the third *Bowditch* category and who are subject to mandatory lifetime SBM based solely on their status as a "recidivist," we modify and affirm the opinion of the Court of Appeals.

<u>Background</u>

Mr. Grady is required by North Carolina statute to enroll in the SBM program and to wear an ankle monitor at all times for the remainder of his life based on two sex crimes that he committed when he was seventeen and twenty-six years old and for which he has fully served his criminal sentences. *State v. Grady*, 817 S.E.2d 18 (N.C. Ct. App. 2018). On 13 September 2006, Grady pleaded guilty to indecent liberties with a child and was sentenced to a minimum of thirty-one and a maximum of thirty-eight months of imprisonment. For felony sentencing purposes, Grady stipulated to the aggravating factor that the fifteen-year-old victim was impregnated as a result of his crime, which occurred when he was twenty-six years old. He also stipulated to certain prior convictions, including a 16 January 1997 plea of no contest to a second-degree sex offense committed when he was seventeen years old and a 6 January 2004 plea of guilty to failure to register as a sex offender. Grady was unconditionally released from prison on 25 January 2009 and received certification that his rights of citizenship were "BY LAW AUTOMATICALLY RESTORED."

Over a year later, on 12 March 2010, the North Carolina Department of Correction (DOC) sent a letter to Grady informing him that it had made an initial determination that he met the statutory criteria of a "recidivist," which would require his enrollment in the SBM program, and giving him notice to appear at a hearing at which the court would determine his eligibility for SBM. Before a hearing was held, he pleaded guilty on 27 October 2010 to failure to maintain his address with the sex offender registry and was sentenced to twenty-four to twenty-nine months in prison.

He served that term of imprisonment and was again unconditionally released on 24 August 2012. A new hearing was scheduled for 14 May 2013 in the Superior Court in New Hanover County to determine if Grady should be required to enroll in the State's SBM program.

## North Carolina's SBM Program

North Carolina's SBM program for sex offenders[1] became effective on 1 January 2007 as a result of the ratification of "An Act To Protect North Carolina's Children/Sex Offender Law Changes," which directed the DOC to "establish a sex offender monitoring program that uses a continuous satellite-based monitoring system . . . . to monitor" the locations of certain categories of sex offenders. An Act To Protect North Carolina's Children/Sex Offender Law Changes, ch. 247, sec. 15, 2005 N.C. Sess. Laws (Reg. Sess. 2006) 1065, 1074–79 (codified as amended at N.C.G.S. §§ 14-208.40 to -208.45 (2017 & Supp. 1 2018)); *see also Bowditch*, 364 N.C. at 337, 700 S.E.2d at 3 ("As authorized by the legislation, DOC established and began administering the SBM program on 1 January 2007."). The General Assembly mandated that the "[SBM] program shall use a system that provides . . . [t]ime-correlated and continuous tracking of the geographic location of the subject using a global positioning system based on satellite and other location tracking technology."

---

[1] North Carolina law also provides for the use of SBM with individuals sentenced to house arrest as a condition of probation, *see* N.C.G.S. § 15A-1343(a1) (2017), or post-release supervision, *see id.* § 15A-1368.4(e)(13) (2017). All references to "the SBM program" herein are only to the statutory framework for sex offenders that is codified as amended at N.C.G.S. §§ 14-208.40 to -208.45 (2017 & Supp. 1 2018).

Ch. 247, sec. 15.(a), 2005 N.C. Sess. Laws (Reg. Sess. 2006) at 1075 (codified as amended at N.C.G.S. § 14-208.40(c)(1)).

In general terms, North Carolina's statutory framework for the satellite-based monitoring of convicted sex offenders establishes that an offender who is (a) classified as a sexually violent predator, (b) a recidivist, (c) convicted of an aggravated offense, or (d) an adult convicted of statutory rape of a child or statutory sex offense with a victim under the age of thirteen must submit to SBM for life. *See* N.C.G.S. §§ 14-208.40A(c), -208.40B(c) (2017). The statutes provide for no individualized assessment of the offender; the court has no discretion over whether to impose SBM or for how long; and no court has the authority to terminate SBM for these individuals. *Id.* All other sex offenders may be ordered to submit to SBM if, based on a risk assessment, the offender "requires the highest possible level of supervision and monitoring." *Id.* §§ 14-208.40A(d)-(e), -208.40B(c) (2017). For these individuals the court specifies the period of time that the offender must be enrolled in the SBM program. *Id.* §§ 14-208.40A(e), -208.40B(c).

Section 14-208.6(2b) of the North Carolina General Statutes defines a "recidivist" as "[a] person who has a prior conviction for an offense that is described in G.S. 14-208.6(4)," which, in turn, defines a "reportable conviction." N.C.G.S. § 14-208.6(2b) (Supp. 1 2018). "Reportable convictions," which encompass a range of statutorily defined sex crimes, including "[a] final conviction for an offense against a minor," "a sexually violent offense," "or an attempt to commit any of those offenses,"

*id.* § 14-208.6(4)(a) (Supp. 1 2018), are final convictions that trigger the registration requirements of the "statewide sex offender registry." *See id.* § 14-208.7(a) (2017) (stating that "[a] person who is a State resident and who has a reportable conviction shall be required to maintain registration with the sheriff of the county where the person resides"). An individual who has a prior conviction for a reportable offense, and therefore meets the statutory definition of a "recidivist," must maintain registration with the sex offender registry for life. *Id.* § 14-208.23 (2017).

An individual who is subjected to lifetime SBM may file a request with the Post-Release Supervision and Parole Commission to terminate the SBM requirement. Such a request, however, cannot be filed until at least one year after the individual: "(i) has served his or her sentence for the offense for which the satellite-based monitoring requirement was imposed, and (ii) has also completed any period of probation, parole, or post-release supervision imposed as part of the sentence." *Id.* § 14-208.43(a) (2017). If the individual has not been convicted of any further reportable offenses and "has substantially complied with the provisions of this Article ["Sex Offender and Public Protection Registration Programs"], the Commission may terminate the monitoring requirement if the Commission finds that the person is not likely to pose a threat to the safety of others." *Id.* § 14-208.43(b) (2017). An individual enrolled in the SBM program "shall cooperate with the Division . . . and the requirements of the [SBM] program." *Id.* § 14-208.42 (2017). Moreover, the Division

shall have the authority to have contact with the offender

at the offender's residence or to require the offender to appear at a specific location as needed for the purpose of enrollment, to receive monitoring equipment, to have equipment examined or maintained, and for any other purpose necessary to complete the requirements of the [SBM] program.

*Id.* An individual who "fails to enroll" or "tampers with, removes, vandalizes, or otherwise interferes with the proper functioning of a [monitoring] device" is guilty of a felony, and it is a Class 1 misdemeanor for an individual to "fail[ ] to provide necessary information . . . or fail[ ] to cooperate with the . . . guidelines and regulations for the program." N.C.G.S. § 14-208.44(a)-(c) (2017); *see also id.* § 14-208.44(d) (2017) ("For purposes of this section, 'enroll' shall include appearing, as directed . . . to receive the necessary equipment.").

If an individual is convicted of a reportable conviction and a court has made no prior SBM determination, as was the case with Grady, the Division of Adult Correction and Juvenile Justice (the Division) is required to make an initial determination whether the individual is required to enroll in SBM, and, if so, to schedule a "bring back" hearing for a court to determine by using the same criteria described above whether the offender must enroll in SBM. *Id.* § 14-208.40B.

Today nearly every state uses SBM to some degree. *See* Avlana Eisenberg, *Mass Monitoring*, 90 S. Cal. L. Rev. 123, 125 (2017). Only twelve states, however,

allow lifetime monitoring,[2] and of those, only two, North Carolina and California, mandate lifetime monitoring without any individualized assessment of risk, even for individuals who have completed their sentences, and without meaningful judicial review over time. *See* Cal. Penal Code § 3004(b) (West 2016); N.C.G.S. §§ 14-208-40A, -208.40B, -208.43. Some states provide for both individualized assessments to determine if lifetime SBM is appropriate and the opportunity to petition a court to be removed from SBM. *See, e.g.*, La. Rev. Stat. Ann. § 15:560.5 (2016); Wis. Stat. § 301.48 (2016).[3] Other states only apply lifetime SBM to offenders who are subject to lifetime parole supervision or who otherwise would receive a sentence of life

---

[2] These states are California, Florida, Kansas, Louisiana, Maryland, Michigan, Missouri, North Carolina, Oregon, Rhode Island, South Carolina, and Wisconsin. Cal. Penal Code § 3004(b) (West 2016); Fla. Stat. § 948.012(4) (2016); Kan. Stat. Ann. § 22-3717(u) (2016); La. Rev. Stat. Ann. § 15:560.3(A)(3) (2016); Md. Code Ann., Crim. Proc. § 11-723(d)(3)(i) (LexisNexis 2016); Mich. Comp. Laws § 750.520n (2016); Mo. Rev. Stat. § 217.735(4) (2016); N.C.G.S. §§ 14-208.40A(c), -208.40B(c); Or. Rev. Stat. §§ 137.700, 144.103 (2016); 11 R.I. Gen. Laws § 11-37-8.2.1 (2016); S.C. Code Ann. § 23-3-540 (Supp. 2018); Wis. Stat. § 301.48 (2016). *See generally Comment: Tracking the Constitution - the Proliferation and Legality of Sex-Offender GPS-Tracking Statutes*, 42 Seton Hall L. Rev. 1169, 1172–90 (2012) (categorizing types of GPS monitoring statutes). Georgia's lifetime monitoring statute, Ga. Code Ann. § 42-1-14(e) (2016), was declared unconstitutional by that state's Supreme Court. *See Park v. State*, 305 Ga. 348, 360–61, 825 S.E.2d 147, 158 (2019).

[3] The dissent refers to Wisconsin's SBM statute as "functionally identical" to North Carolina's statute, quoting *Belleau v. Wall*, 811 F.3d 929, 939 (7th Cir. 2016) (Flaum, J., concurring). While the two statutes may be identical in the sense that they involve GPS monitoring using an ankle bracelet, they do not establish functionally identical programs. Wisconsin's program subjects only child sex offenders to lifetime SBM; individualized assessments are required before some offenders can be enrolled in the program; the department administering the program can substitute passive position system monitoring for active SBM; and both the offender and the department can apply to a court to request termination of lifetime tracking. *See* Wis. Stat. § 301.48 (2016).

imprisonment. *See, e.g.*, Fla. Stat. § 948.012 (2016); Kan. Stat. Ann. § 22-3717(u) (2016); Mo. Rev. Stat. § 217.735 (2016); Or. Rev. Stat. § 144.103 (2016); 11 R.I. Gen. Laws § 11-37-8.2.1 (2016). Still other states provide for individualized assessments and sentencing discretion. *See, e.g.*, Md. Code Ann., Crim. Proc. § 11-723 (LexisNexis 2016); *People v. Kern*, 288 Mich. App. 513, 794 N.W.2d 362 (2010) (per curiam) (holding that defendants put on probation or sent to a local jail as opposed to the penitentiary are not subject to lifetime SBM under Michigan's statute so that the defendant, who was convicted of second-degree criminal sexual conduct, was, because of his jail sentence, not subject to Michigan's lifetime SBM program, citing Mich. Comp. Laws §§ 750.520, 791.285). Finally, several states give offenders the opportunity to petition a court to have the SBM requirement lifted. *See, e.g.*, Mo. Rev. Stat. § 217.735(5) (2016); S.C. Code Ann. § 23-3-540(H) (Supp. 2018). Another characteristic of most of the other eleven state lifetime SBM programs is that, compared with North Carolina's program, they apply to persons convicted of a smaller category of offenses, which typically include only the most egregious crimes involving child victims. As a result, North Carolina makes more extensive use of lifetime SBM than virtually any other jurisdiction in the country.

<u>Grady's SBM Claims</u>

Prior to the 14 May 2013 bring back hearing, Grady filed a motion to deny the State's SBM application and to dismiss the proceeding, in which he argued, *inter alia*, that "the imposition of the monitoring upon Defendant violates his rights to be free

from unreasonable search and seizure as guaranteed by the Fourth Amendment of the United States Constitution and Article I, Section 20 of the North Carolina Constitution." At the hearing, the State argued that, based on the evidence of Grady's conviction for taking indecent liberties with a child and his prior conviction for second-degree sex offense, he met the statutory definition of being a "recidivist"—that is, a person who has a prior conviction for a reportable offense. N.C.G.S. § 14-208.6(2b). Grady conceded that he qualified as a recidivist under the statute but argued, *inter alia*, that "the imposition of the GPS monitoring device itself and the 24/7 tracking" constitute an unreasonable search and seizure under both the state and federal constitutions, and the statute subjecting him to SBM is "unconstitutional on its face, and as it applies to Mr. Grady." The trial court denied Grady's motion, finding that the SBM program is not unconstitutional. The trial court further found that Grady met the statutory definition of "recidivist" and, accordingly, ordered him to enroll in the SBM program "for the remainder of the defendant's natural life." Grady appealed the trial court's order imposing lifetime SBM to the Court of Appeals.

At the Court of Appeals, Grady argued that " 'the constant GPS monitoring (and the imposition of the GPS equipment for that purpose)' used in SBM violates his constitutional protections against unreasonable searches and seizures," *State v. Grady*, 233 N.C. App. 788, 759 S.E.2d 712, 2014 WL 1791246, at *1 (2014) (unpublished), relying on the United States Supreme Court's decision in *United States v. Jones*, 565 U.S. 400, 404 (2012) ("We hold that the Government's installation

of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " (footnote omitted)).  The Court of Appeals, in an unpublished opinion, determined that it was bound by the decision of a prior panel that had "considered and rejected the argument that 'if affixing a GPS to an individual's vehicle constitutes a search of the individual, then the arguably more intrusive act of affixing an ankle bracelet to an individual must constitute a search of the individual as well.' " *Grady*, 2014 WL 1791246, at *2 (quoting *State v. Jones*, 231 N.C. App. 123, 127, 750 S.E.2d 883, 886 (2013)).  After this Court dismissed defendant's appeal and denied his petition for discretionary review, *State v. Grady*, 367 N.C. 523, 762 S.E.2d 460 (2014), the United States Supreme Court granted his petition for writ of certiorari, *Grady*, 135 S. Ct. at 1371.

In a per curiam opinion, the Supreme Court stated that the Court of Appeals' determination that North Carolina's "system of nonconsensual satellite-based monitoring does not entail a search within the meaning of the Fourth Amendment" is "inconsistent with [the] Court's precedents." *Id.* at 1370; *see Jones*, 565 U.S. at 406 n.3 ("Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, . . . a search has undoubtedly occurred."); *see also Florida v. Jardines*, 569 U.S. 1, 11 (2013) (reaffirming that a search occurs "when the government gains evidence by physically intruding on constitutionally protected areas" (citing *Jones*, 565 U.S. at 409)).  The Court opined that, in light of its previous decisions, "it follows that a State also conducts a search when it attaches a device to

a person's body, without consent, for the purpose of tracking that individual's movements." *Grady*, 135 S. Ct. at 1370. The Court noted, however, that this conclusion did not end the analysis, because a search must be unreasonable in order to be unconstitutional. *Id.* at 1371. Accordingly, the Court granted defendant's petition for writ of certiorari, vacated the Court of Appeals' decision, and "remanded for further proceedings not inconsistent with this opinion." *Id.*

On 11 June 2015, this Court issued an order remanding the matter to the Court of Appeals for reconsideration in light of the decision of the United States Supreme Court. On 23 October 2015, defendant filed in the Court of Appeals a "Motion to Remand to Superior Court and to Stay the Order Imposing [SBM]." The Court of Appeals issued an order on 6 November 2015 granting defendant's motion to remand the case to superior court while denying his motion to stay SBM.

On 16 June 2016, the Superior Court in New Hanover County held a remand hearing to determine whether subjecting defendant to nonconsensual lifetime SBM constitutes a reasonable search under the Fourth Amendment. At the hearing, the State presented evidence, including: a certified copy of the judgment and commitment for defendant's prior conviction for second-degree sex offense; defendant's criminal record; printouts of N.C.G.S. §§ 14-208.5 (stating the "Purpose" of Article 27A) and 14-208.43 ("Request for termination of satellite-based monitoring requirement"); and two photographs of the equipment currently used in the program:

the ExacuTrack One ankle monitor (or ET-1) and its accompanying "beacon"—a device that must be placed in the home of the individual subjected to SBM.

Grady, on the other hand, presented evidence that included statistical reports tending to show that sex offenders are less likely to reoffend than other categories of convicted felons and that the vast majority of sex offenses are committed against victims who know their offender, statistical information about individuals currently enrolled in the State's SBM program, the Policy and Procedure Manual from the Department of Community Corrections governing "Technology and Monitoring Programs," including SBM, the ET-1's instructional "client guide" provided to monitored individuals, the Division's "Guidelines and Regulations" form that is required to be signed by monitored individuals, and an excerpt from the Division's "Train the Trainer" SBM training session.

The only witness called by the State was Scott Pace, a probation supervisor in the Division, who brought with him an ET-1 and a beacon. Officer Pace testified to the operation of the SBM equipment and to his understanding of the program. An individual enrolled in the SBM program is not permitted to remove the ET-1, which is required to be worn at all times, and it is a felony to attempt to remove or interfere with it. According to Pace, the ET-1 weighs 8.7 ounces, "about half a pound," and is "waterproof up to 15 feet," allowing the individual to shower, bathe, or swim in a pool or the ocean. Pace explained that the individual is responsible for maintaining the charge of the ET-1's lithium battery and added that "if they're moving a lot, if there's

a lot of activity . . . the more battery it uses." Moreover, Pace stated that "[t]he batteries have a life span" and as the battery ages, "it won't hold a charge as long." The individual must charge the ET-1 two hours every day by plugging it into an electrical outlet, during which time the individual must remain tethered to the wall by the ET-1's fifteen foot charging cord. According to Pace, "we tell them to charge it two hours a day just so they don't lose the charge. Failure to charge the monitor, we'll lose signal, . . . and that is a violation."[4]

When the charge of the ET-1's battery runs low, Pace explained, "the unit will actually talk to you and it will say, 'low battery, go charge.'" "That message will keep repeating itself until they acknowledge" by placing a finger on a divot on the ET-1. Pace explained that officers can send other messages to individuals through the ET-1's audible message system, such as "Call your officer," and that "they're supposed to follow the message, whatever the message may be." Similarly, the ET-1 plays a repeating voice message when the signal is lost. Pace testified that "there can be issues with equipment" and the ET-1 can temporarily lose signal due to the positioning of satellites. Moreover, "[h]omes with metal roofs kind of interfere[ ] with the signal. Big buildings, such as WalMart. When they go in places such as that it could interfere with the signal." In those situations, Pace explained, individuals are

---

[4] This instruction is reflected in the Division's "Train the Trainer" materials introduced into evidence by defendant, which states: "Charge for 2 hours per day."

"supposed to go outside and try to gain signal back" and to acknowledge the alert by pressing the divot on the ET-1.

Individuals subjected to SBM must also submit to quarterly equipment checks at their homes. Pace stated that every three months, Division officers go to the individual's house to "make sure that the equipment has not been tampered with . . . and that it's in correct working order." Pace testified that while an individual could technically refuse entry into the home, "[w]e prefer to go in the house" in order "to see where the beacon is at, because it has to be situated a certain way." Additionally, the Division's "Guidelines and Regulations," which the individual is required to sign upon enrollment, provide: "I understand a unit in the home will be assigned to me and it will be necessary for a designated representative of SCC to enter my residence or other location(s) where I may temporarily reside to install, retrieve, or periodically inspect the unit."

Pace testified that the "mapping function" allows him to retrieve historical location information "up to I think it's six months, and after six months we can call [the equipment provider], and back further than that they keep them, and they can send them to us via email." The mapping function also allows officers to observe monitored individuals in real time. As Pace testified, "For SBM cases, yes, it's 24-7, it's live, current location." Regarding the accuracy of the location information, Pace stated: "In my experience, it's been pretty accurate. I mean, people that's taken it off, I've gone right to the locations and retrieved units that people's taken off and

discarded on streets, trash cans, in the woods. I mean, it's taken me right there to it, you know."

After receiving the evidence and considering the oral and written arguments of the parties, the superior court entered an order on 26 August 2016 upholding the imposition of lifetime SBM on defendant. The court summarized the evidence at length. Among other things, the trial court noted:

> The ankle monitor does not monitor or reveal the activities of the offender—it merely monitors his location. The device does not confine the person to their residence or any other specific location. The ankle monitor and related equipment requires a quarterly (three months) review/inspection by the State to ensure that the device is in proper working order.
>
> In addition to Officer Pace's testimony, the State also entered into evidence photographs of the SBM equipment, certified copies of the judgments for the two sex offenses, the defendant's criminal history, and statutory provisions of Part 5 of Article 27A of Chapter 14 of N.C.G.S. ("Sex Offender Monitoring"). In both his cross examination of the State's witness Officer Pace and in his case-in-chief, the defendant admitted into evidence, among other exhibits, multiple studies of recidivism rates of sex offenders versus other criminals; the State's policy, procedures and rules governing SBM, and additional photographs of the SBM equipment.

The court ultimately concluded[5] that

---

[5] To determine the appropriate legal test of reasonableness under the Fourth Amendment, the trial court relied on two cases from other jurisdictions, *People v. Hallak*, 310 Mich. App. 555, 873 N.W.2d 811 (2015), *rev'd in part and remanded*, 499 Mich. 879, 876 N.W.2d 523 (2016) (per curiam order), and *Belleau v. Wall*, 811 F.3d 929 (7th Cir. 2016). To assess North Carolina's interest in preventing recidivism, the trial court relied on *Smith v.*

> based on the totality of the circumstances analysis, . . . satellite based monitoring of the defendant is a reasonable search.
>
> The Court has considered defendant's argument that the satellite based monitoring statute is facially unconstitutional. The Court rejects this argument and finds that the statute is constitutional on its face.

Accordingly, the trial court ordered defendant to enroll in SBM "for the remainder of [his] natural life." Defendant appealed the trial court's order to the Court of Appeals.

At the Court of Appeals, defendant argued that the State failed to establish that the imposition of lifetime SBM is a reasonable search. *Grady*, 817 S.E.2d at 22. In a divided opinion filed on 15 May 2018, the Court of Appeals reversed the trial court's SBM order. *Id.* at 28. The Court of Appeals majority noted that the imposition of SBM intruded upon defendant's Fourth Amendment interests by the physical attachment of the ankle monitor to his body, "a constitutionally protected area," and through the monitor's continuous GPS tracking. *Id.* at 25 (quoting *Jones*, 565 U.S. at [407] n.3). The majority determined that the physical intrusion caused by the permanent attachment of the ankle monitor, along with its audible voice messages and the necessity of charging it for two hours daily, was "more inconvenient than intrusive, in light of defendant's diminished expectation of privacy as a convicted sex

---

*Doe*, 538 U.S. 84, 103 (2003) ("The risk of recidivism posed by sex offenders is 'frightening and high.'" (quoting *McKune v. Lile*, 536 U.S. 23, 34 (2002) (plurality opinion)), and *McKune*, 536 U.S. at 32–33 ("Sex offenders are a serious threat in this Nation. . . . When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault.")).

offender." *Id.* On the other hand, the majority stated that the continuous GPS tracking was "uniquely intrusive." *Id.* (quoting *Belleau v. Wall*, 811 F.3d 929, 940 (7th Cir. 2016) (Flaum, J., concurring)). The majority acknowledged the State's compelling interest in protecting the public from sex offenders but determined that "the State failed to present any evidence of [SBM's] efficacy in furtherance of the State's undeniably legitimate interests." *Id.* at 27. Accordingly, the majority concluded that although, based solely on his status as a sex offender, "defendant's expectation of privacy is appreciably diminished as compared to law-abiding citizens," the State failed to establish "that lifetime SBM of defendant is a reasonable search under the Fourth Amendment." *Id.* at 28.

In a separate opinion, one member of the panel dissented from the majority's conclusion that lifetime SBM of defendant is unreasonable and thus would have affirmed the trial court's order. *Id.* (Bryant, J., dissenting). Believing that "the majority asks the State to meet a burden of proof greater than our General Assembly envisioned as necessary and greater than Fourth Amendment jurisprudence requires," *id.*, the dissenting judge concluded that under the totality of the circumstances, "the degree to which SBM participation promotes legitimate governmental interests—the prevention of criminal conduct or the apprehension of defendant should he reoffend," outweighed "the degree to which participation in the SBM program intrudes upon defendant's privacy." *Id.* at 31.

On 19 June 2018, the State filed a notice of appeal as of right based on the dissenting opinion in the Court of Appeals pursuant to N.C.G.S. § 7A-30(2).

Standard of Review

In reviewing a trial court order, "we are 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, . . . and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)). We review decisions of the Court of Appeals for errors of law. *State v. Romano*, 369 N.C. 678, 685, 800 S.E.2d 644, 649 (2017) (citing *State v. Brooks*, 337 N.C. 132, 149, 446 S.E.2d 579, 590 (1994)).

"Whether a statute is constitutional is a question of law that this Court reviews de novo." *Id.* at 685, 800 S.E.2d at 649. "In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond [a] reasonable doubt." *Cooper v. Berger*, 370 N.C. 392, 413, 809 S.E.2d 98, 111 (2018) (quoting *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016)). "The presumption of constitutionality is not, however, and should not be, conclusive." *Moore v. Knightdale Bd. of Elections*, 331 N.C. 1, 4, 413 S.E.2d 541, 543 (1992).

Analysis

Defendant argues that North Carolina's SBM program effects an unreasonable search and is unconstitutional both on its face and as applied to him under the Fourth Amendment to the United States Constitution. In light of our analysis of the program and the applicable law, we conclude that the State's SBM program is unconstitutional in its application to all individuals in the same category as defendant—specifically, individuals who are subject to mandatory lifetime SBM based solely on their status as a statutorily defined "recidivist"[6] who have completed their prison sentences and are no longer supervised by the State through probation, parole, or post-release supervision. We decline to address the application of SBM beyond this class of individuals.

"A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015); *see also id.* (explaining that facial challenges to "statutes authorizing warrantless searches" can be brought under the Fourth Amendment). A party making a facial challenge "must

---

[6] We stress that our holding applies to individuals who, like defendant, are subjected to mandatory lifetime SBM based *solely* on a finding that they meet the statutory definition of a "recidivist." We do not address the constitutionality of the SBM program as applied to the other subcategories of offenders to which mandatory lifetime SBM applies, even if they may also qualify as a recidivist. *See* N.C.G.S. §§ 14-208.40A(c), -208.40B(c) (stating that an offender who is classified as a sexually violent predator, convicted of an aggravated offense, or is an adult convicted of statutory rape of a child or statutory sex offense with a victim under the age of thirteen must submit to SBM for life). In other words, contrary to the assertions by the dissent, if, for example, an offender is determined to be both a sexually violent predator and a recidivist (unlike Mr. Grady), our holding in this case does not address the constitutionality of an order requiring that offender to enroll in the SBM program for life on the grounds of being a sexually violent predator.

establish that a 'law is unconstitutional in all of its applications.' " *Id.* at 2451 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). In contrast, "the determination whether a statute is unconstitutional as applied is strongly influenced by the facts in a particular case." *State v. Packingham*, 368 N.C. 380, 393, 777 S.E.2d 738, 749 (2015), *rev'd and remanded*, 137 S. Ct. 1730 (2017). This case was remanded by the United States Supreme Court with instructions to "examine whether the State's monitoring program is reasonable." *Grady*, 135 S. Ct. at 1371. While this directive could be interpreted as instructing us to address the facial constitutionality of the State's SBM program in its entirety, we address instead the constitutionality of the SBM program as applied to the narrower category of recidivists to which defendant belongs. *See Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 472, 206 S.E.2d 141, 145 (1974) ("[W]hen asked to determine the constitutionality of a statute, the Court will do so only to the extent necessary to determine that controversy. It will not undertake to pass upon the validity of the statute as it may be applied to factual situations materially different from that before it." (citations omitted)).

The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967); *see Schmerber v. California*, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."); *see also*

*Riley v. California*, 134 S. Ct. 2473, 2494 (2014) ("[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."). In reviewing the constitutionality of a search, "the ultimate measure . . . is 'reasonableness,' " which " ' "is judged by balancing [the search's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." ' "[7] *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652–53 (1995) (quoting *Skinner v. Ry. Labor Execs.' Ass'n.*, 489 U.S. 602, 619 (1989)).

The Supreme Court has explained that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant" supported by a showing of probable cause.[8] *Id.* at 653 (citing *Skinner*, 489 U.S. at 619); *see Camara*, 387 U.S. at 528–29 ("[O]ne governing principle . . . has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper

---

[7] In the interest of brevity and clarity, additional references to this quotation will eliminate parenthetical information and internal quotation marks.

[8] A judicial warrant serves to "assure[ ] the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope" and "also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." *Skinner*, 489 U.S. at 622 (citations omitted); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) (explaining that "the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police' " (alteration in original) (quoting *Wong Sun v. United States*, 371 U.S. 471, 481–82 (1963))).

consent is 'unreasonable' unless it has been authorized by a valid search warrant." (citations omitted)). Therefore, we start with the "basic Fourth Amendment principle" that warrantless searches are presumptively unreasonable. *United States v. Karo*, 468 U.S. 705, 714–15 (1984).

Nonetheless, "there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (citations omitted). Exceptions to the warrant requirement "are 'jealously and carefully drawn,' " and the "burden is on those seeking the exemption to show the need for it." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (first quoting *Jones v. United States*, 357 U.S. 493, 499 (1958); then quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

Additionally, in the absence of a warrant, "the Court has preferred 'some quantum of individualized suspicion . . . [as] a prerequisite to a constitutional search or seizure.' " *Maryland v. King*, 569 U.S. 435, 447 (2013) (alterations in original) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976)); *see also Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." (citing *Vernonia*, 515 U.S. at 652–53)). Yet individualized suspicion is not required in every case, because "[t]he touchstone of the Fourth Amendment is

reasonableness, not individualized suspicion." *Samson v. California*, 547 U.S. 843, 855 n.4 (2006); *see also King*, 569 U.S. at 447 ("[T]he Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." (quoting *Martinez-Fuerte*, 428 U.S. at 561)).

Here the State contends that the SBM program falls within a category of "special needs" searches, described in some cases as another exception to the requirement of an individualized warrant.[9] The Supreme Court has recognized that programmatic searches performed in the absence of a warrant or individualized suspicion may be permissible "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *O'Connor v. Ortega*, 480 U.S. 709, 720 (1987)

---

[9] Defendant asserts, and the Court of Appeals below agreed, that the State waived its special needs argument by failing to raise this issue in the trial court. Given that the Supreme Court in its remand order cited to *Vernonia*, a special needs case that was cited by the State in the trial court, and given the significant role that this issue often plays in the totality-of-the-circumstances analysis, we will address this issue on the merits as part of the reasonableness inquiry. We note that the balancing test articulated in *Vernonia*, 515 U.S. at 652–53 ("[W]hether a particular search meets the reasonableness standard " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." ' " (quoting *Skinner*, 489 U.S. at 619)), is not unique to special needs cases, but rather is the same general Fourth Amendment balancing test that weighs " 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy,' " *King*, 569 U.S. at 448 (alteration in original) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)), or, as the Supreme Court phrased the test in its per curiam decision, the "nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations," *Grady*, 135 S. Ct. at 1371.

(quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)).[10] "When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314 (first citing *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665–66 (1989); then citing *Skinner*, 489 U.S. at 668).

Although the State asserts, somewhat ambiguously, that SBM is "in full accord with the analysis applicable to special needs searches," the State never actually identifies[11] any special need "beyond the normal need for law enforcement." *Griffin*

---

[10] For example, the Court has recognized special needs in the context of a State's supervision of probationers by probation officers, "a situation in which there is an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker." *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987); *see also, e.g.*, *Vernonia*, 515 U.S. at 653–54 (recognizing " 'special needs' to exist in the public school context" in which "children . . . have been committed to the temporary custody of the State as schoolmaster"); *cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 44 n.1 (2000) (not recognizing any special need in the state's vehicular narcotics checkpoints because the "primary purpose . . . is to advance the general interest in crime control").

[11] The State asserts that a special need must only go "beyond the regular law enforcement duty" and argues that the dangerousness of sex offenders gives rise to a special need just as the dangerousness of impaired drivers gave rise to a special need justifying the sobriety checkpoints in *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990). In *Sitz* the Court did not find any special need; instead, it concluded that prior decisions involving checkpoints required addressing reasonableness under general balancing principles. *See id.* at 450 (rejecting the respondents' argument based on *Von Raab* "that there must be a showing of some special governmental need 'beyond the normal need' for criminal law enforcement before a balancing analysis is appropriate" and stating that *Von Raab* "was in no way designed to repudiate our prior cases dealing with police stops of motorists on

*v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *T.L.O.*, 469 U.S. at 351). Because

defendant is not on probation or supervised release, but rather is unsupervised, this

is not a situation, as in *Griffin*, in which there is any "ongoing supervisory

relationship" between defendant and the State. *Id.* at 879; *see also id.* at 875 (stating

that "[probation] restrictions are meant to assure that the probation serves as a

period of genuine rehabilitation"). Nor is there any indication in the record that the

"primary purpose" of SBM is anything other than to "advance the general interest in

crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 n.1 (2000).

---

public highways," "which utilized a balancing analysis" (citations omitted)). Other checkpoint cases that implicate special governmental needs are based on either controlling illegal immigration near the border or regulating highway safety. *See Edmond*, 531 U.S. at 41 ("We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. . . . [E]ach of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety.").

On the contrary, as Officer Pace testified and as the State repeatedly made clear in its brief[12] and at oral arguments,[13] the primary purpose of SBM is to solve crimes. This intent is also reflected in the SBM program's enabling legislation, *see* N.C.G.S. § 14-208.40(d) (providing that the SBM program is designed to "monitor subject offenders and correlate their movements to reported crime incidents"); *see also id.* § 14-208.5 (2017) (providing that the purpose of the Article is to assist "law enforcement officers' efforts to protect communities, conduct investigations, and quickly apprehend offenders"), as well as the statutory definition of "satellite-based monitoring" in the Criminal Procedure Act, *see id.* § 15A-101.1(3a) (defining SBM as "monitoring with [a] . . . device . . . that timely records and reports or records the person's presence near or within a crime scene or prohibited area or the person's departure from a specified geographic location, and that has incorporated into the

---

[12] The State explained in its brief: "While the [ankle monitor] cannot itself physically prevent a crime, it is a useful investigative tool for law enforcement in *solving crimes and excluding monitored offenders as suspects*"; SBM "*speed[s] up apprehension of criminals* before they commit additional crimes"; "[t]his case presents one of those circumstances where the government's *need to detect or deter criminal violations* is sufficiently compelling to justify the search authorized by the [SBM] program for convicted sex offenders"; "[w]hile deterrence may be difficult to demonstrate, a more easily understood use of the location information gained from this search is *speed in 'apprehension of criminals before they commit additional crimes' "*; and SBM has " 'the potential to significantly improve both the criminal justice system and police investigative practices' by *quickly identifying those who are or may be guilty and quickly eliminating those who are not.*" (Emphases added.) (Citations omitted.)

[13] The State, when asked a direct question at oral argument ("Just so I look at this correctly, what does the State contend the *specific purpose* of this program is?"), responded: "The *specific purpose* of this program is to allow law enforcement to be able to *investigate and quickly apprehend sex offenders* to protect the public from sex offenders."

software the ability to automatically compare crime scene data with locations of all persons being electronically monitored so as to provide any correlation daily or in real time"). Because the State has not proffered any "concerns other than crime detection," *Chandler*, 520 U.S. at 314, the "special needs" doctrine is not applicable here. *Cf. Park v. State*, 305 Ga. 348, 356, 825 S.E.2d 147, 155 (2019) (holding that Georgia's SBM program is not "divorced from the State's general interest in law enforcement" and therefore does not come within the scope of the special needs exception).

We cannot agree with defendant, however, that this determination is dispositive of the reasonableness inquiry. On the contrary, the Supreme Court instructed us that "[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*, 135 S. Ct. at 1371. Therefore, we must consider whether the warrantless, suspicionless search here is reasonable when "its intrusion on the individual's Fourth Amendment interests" is balanced "against its promotion of legitimate governmental interests." *Vernonia*, 515 U.S. at 652–53.

### I. Intrusion Upon Reasonable Privacy Expectations

#### A. Nature of the Privacy Interest

In addressing the search's "intrusion on the individual's Fourth Amendment interests," "[t]he first factor to be considered is the nature of the privacy interest upon

which the search here at issue intrudes," or, in other words, "the scope of the legitimate expectation of privacy at issue." *Id.* at 652–54, 658. Notably, "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate,' " which "varies . . . with context, . . . depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." *Id.* at 654 (quoting *T.L.O.*, 469 U.S. at 338 (majority opinion)). The SBM program implicates a number of constitutionally-recognized privacy concerns.

First, the SBM program, which requires "attach[ing] a device to a person's body, without consent," *Grady*, 135 S. Ct. at 1370, and which prohibits the removal of that device, implicates defendant's Fourth Amendment interest in "be[ing] secure in [his] person." U.S. Const. amend. IV. The Supreme Court specifically noted that the SBM program "is plainly designed to obtain information. And since it does so by physically intruding on a subject's body, it effects a Fourth Amendment search." *Grady*, 135 S. Ct. at 1371. Additionally, the equipment checks performed by government officers every three months, during which defendant must allow them entrance into his home, implicate his "right . . . to be secure in [his] . . . house[ ]." U.S. Const. amend. IV; *see Silverman v. United States*, 365 U.S. 505, 511 (1961) (stating that "[a]t the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (first citing *Entick v. Carrington*, 19 Howell's State Trials 1029, 1066

(1765); then citing *Boyd v. United States*, 116 U.S. 616, 626–30 (1886)). Finally, the search's GPS location monitoring implicates an expectation of privacy recently addressed by the Supreme Court in *Carpenter v. United States*—defendant's "expectation of privacy in his physical location and movements." 138 S. Ct. 2206, 2215 (2018).

The Court in *Carpenter*, after analyzing two lines of cases stemming from *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Jones*, 565 U.S. 400 (2012), concluded that "when the Government accessed CSLI [cell-site location information] from the [petitioner's] wireless carriers, it invaded [the petitioner's] reasonable expectation of privacy in the whole of his physical movements" and thereby conducted a search. *Carpenter*, 138 S. Ct. at 2219. The Court explained:

> A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S., at 351–352. . . .
>
> . . . Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." [*Jones*, 565 U.S.] at 415 (opinion of SOTOMAYOR, J.). These location records "hold for many Americans the 'privacies of life.' " *Riley*, 134 S. Ct., at 2494–2495 (quoting *Boyd*, 116 U.S., at 630). And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the

> Government can access each carrier's deep repository of historical location information at practically no expense.
>
> In fact, historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*. Unlike the bugged container in *Knotts* or the car in *Jones*, a cell phone— almost a "feature of human anatomy," *Riley*, 134 S. Ct., at 2484—tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

*Id.* at 2217–18 (first alteration in original) (citations omitted).

The SBM program "present[s] even greater privacy concerns than the" CSLI considered in *Carpenter*. *Id.* at 2218. While a cell phone tracks more closely the movements of its owner than the bugged container in *Knotts* or the car in *Jones* because it is "almost a 'feature of human anatomy,' " *id.*, the ankle monitor becomes, in essence, a feature of human anatomy, *see id.* ("[W]hen the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user."). Thus, SBM does not, as the trial court concluded, "merely monitor[ ] [defendant's] location"; instead, it "gives police access to a category of information otherwise unknowable," *id.*, by "provid[ing] an all-encompassing record of the holder's whereabouts," and "an intimate window into

[defendant's] life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations,' " *id.* at 2217 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)); *id.* ("These location records 'hold for many Americans the "privacies of life." ' " (quoting *Riley*, 134 S. Ct. at 2494–95)). As the Court of Appeals majority stated, the SBM program's "continuous warrantless search of defendant's location" is "uniquely intrusive." *Grady*, 817 S.E.2d at 25 (majority opinion) (quoting *Belleau*, 811 F.3d at 940).

The State disputes the legitimacy of defendant's expectations of privacy, contending that defendant's legitimate expectations of privacy are diminished due to his status as a convicted sex offender.[14] Even if, as the State contends, defendant's

_____

[14] The Supreme Court has found certain types of individuals to have *diminished* expectations of privacy, including individuals arrested for serious offenses, *see King*, 569 U.S. at 462 ("The expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.' " (alteration in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979))), probationers and parolees, *see, e.g.*, *Griffin*, 483 U.S. at 874 (explaining that "[p]robation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments" and probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions' " (second and third alterations in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972))); *see also Samson*, 547 U.S. at 850 ("On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."), railroad employees based upon their voluntary participation in an industry with a history of extensive regulation, *Skinner*, 489 U.S. at 627 (stating that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively"), and high school athletes based upon both "the schools' custodial and tutelary responsibility for children," *Vernonia*, 515 U.S. at 656, and the students' voluntary participation in school sports, *id.* at 657 (stating that "[s]chool sports are not for the bashful" and "there is 'an element of "communal undress" inherent in athletic participation' " (quoting *Schaill v. Tippecanoe Cty. Sch. Corp.*, 864 F.2d 1309, 1318 (7th Cir. 1988)), amended by *Schaill*, 864 F.2d 1309 (1989)).

expectations of privacy, in comparison to those of the public at large, are "greatly diminished," even "drastically reduced," "by virtue of the various conditions imposed by the sex offender registry, including the ongoing collection of otherwise private information made available to law enforcement and the public at large," defendant's expectations of privacy are not completely eliminated. Moreover, the State has vastly overstated the extent to which defendant's expectation of privacy is diminished by the requirement that he participate in the sex offender registry. When registering with the sex offender registry, an individual must give the sheriff certain information, including, in pertinent part: the person's full name, any aliases, date of birth, sex, race, height, weight, eye color, hair color, driver's license number, home address, the type of offense for which the person was convicted, the date of conviction, the sentence imposed, a current photograph taken by the sheriff at the time of registration, the person's fingerprints taken by the sheriff at the time of registration, and any online identifier that the person uses or intends to use. N.C.G.S. § 14-208.7(b) (2017). Most of this information becomes public record and is part of the registry that is maintained by the Department of Public Safety and made available for public inspection on the Internet. *Id.* § 14-208.10 (2017). Before changing their addresses, individuals required to register also must report in person and give written notice to the sheriff; the same in-person reporting requirements apply to registrants who

---

The Supreme Court has never reached such a conclusion with respect to individuals convicted of committing sex crimes who are not subject to ongoing governmental supervision.

intend to move to another state, change their academic status, change their employment status (if obtaining or terminating employment at an institution of higher education), change or add an online identifier, or change their name. *Id.* § 14-208.9 (2017). Additionally, an offender is subject to criminal penalties for failure to comply with the registration requirements. *Id.* § 14-208.11 (2017).

None of the conditions imposed by the registry implicate an individual's Fourth Amendment "right . . . to be secure in [his] person[ ]" or his expectation of privacy "in the whole of his physical movements," *Carpenter*, 138 S. Ct. at 2219. We recognize that an individual required to register has a diminished expectation of privacy with respect to the information and other materials provided to the sheriff and made available to the public online, but we cannot agree with the State that these statutory requirements "greatly diminish[ ]" that individual's expectation of privacy in every context.[15] Even if defendant has no reasonable expectation of privacy concerning where he lives because he is required to register as a sex offender, he does not thereby forfeit his expectation of privacy in all other aspects of his daily life. This is especially true with respect to unsupervised individuals like defendant who, unlike probationers and parolees, are not on the "continuum of possible [criminal] punishments" and have no ongoing relationship with the State. *Griffin*, 483 U.S. at

---

[15] The same is true of other limitations to which our dissenting colleagues direct our attention, including the exclusion of sex offenders from certain occupations and certain locations, such as schools.

874; *see also Packingham*, 137 S. Ct. at 1737 (holding unconstitutional a state statute that prohibited sex offenders from accessing social networking websites and noting the "troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system"). The State does not explain how defendant's provision of limited information concerning his address, employment, and appearance, in addition to his photograph and fingerprints, as part of a "civil, regulatory scheme" meaningfully reduces his expectation of privacy in his body and in his every movement every day for the rest of his life. *See, e.g.*, *Park*, 305 Ga. at 355, 825 S.E.2d at 154 (holding that there is no reduced expectation of privacy by virtue of participation in a sex offender registry because "[w]hile the registration requirements . . . reveal information such as the convicted sex offender's address and restrict certain areas where the offender may be legally present . . . this has nothing to do with State officials *searching* that individual by attaching a device to his body and constantly tracking that person's movements in order to look for evidence of a crime without a warrant").

The State also argues, relying on *Bowditch*, that defendant's expectations of privacy are diminished due to his status as a convicted felon. *See Bowditch*, 364 N.C. at 349–50, 700 S.E.2d at 11 ("[I]t is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony." (citations omitted)). However, this reads too much into *Bowditch*'s limited

assessment of Fourth Amendment protections. The Court in *Bowditch* rejected the defendants' challenges to the SBM program under the ex post facto clauses of our state and federal constitutions, concluding that the legislature established North Carolina's SBM program not as a punishment but as a civil, regulatory scheme. *Id.* at 351–52, 700 S.E.2d at 12–13. In support of this contention, Mr. Bowditch argued that the SBM program was punitive because it required people to waive their Fourth Amendment rights with respect to their homes by granting Division of Community Corrections personnel regular access to their residences for equipment maintenance. *Id.* at 363–64, 700 S.E.2d at 19–20 (Hudson, J., dissenting) (in-home equipment maintenance requirement "is a clear infringement on their Fourth Amendment rights"). In response, the majority concluded that "felons convicted of multiple counts of indecent liberties with children are not visited by DCC personnel for random searches, but simply to ensure the SBM system is working properly." *Id.* at 350, 700 S.E.2d at 11 (majority opinion). *Bowditch* did not address the defendants' expectations of privacy with respect to the physical search of their person or their expectations of privacy in their location and movements.

Moreover, the cases relied upon in *Bowditch* to support the general proposition that persons convicted of felonies forfeit certain constitutional protections either deal exclusively with prisoners and probationers, do not hold that a conviction creates a diminished expectation of privacy, or do not address privacy rights at all. *See Griffin*, 483 U.S. at 880 (upholding certain limited warrantless searches of individuals' homes

during their probation); *Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003) (per curiam) (rights of inmates serving prison sentences); *Russell v. Gregoire*, 124 F.3d 1079, 1093–94 (9th Cir. 1997) (stating that an analysis of privacy rights does not assume a diminished expectation of privacy simply because the individual was previously convicted of a crime), *cert. denied*, 523 U.S. 1007 (1998); *Jones v. Murray*, 962 F.2d 302, 310–11 (4th Cir.) (holding that Virginia's DNA data bank program, requiring inmates to involuntarily provide a blood sample before their release, is a reasonable search under the Fourth Amendment because inmates have a "questionable claim of privacy to protect" their identity and because the intrusion is "minimal"), *cert. denied*, 506 U.S. 977 (1992); *Standley v. Town of Woodfin*, 362 N.C. 328, 661 S.E.2d 728 (2008) (does not address privacy rights); *State v. Bryant*, 359 N.C. 554, 614 S.E.2d 479 (2005) (does not involve privacy rights).

Contrary to the State's argument, there is no precedent for the proposition that persons such as defendant, who have served their sentences and whose legal rights have been restored to them (with the exception of the right to possess firearms, *see* N.C.G.S. § 13-1 (2017)), nevertheless have a diminished expectation of privacy in their persons and in their physical locations at any and all times of the day or night for the rest of their lives. Indeed, courts that have examined this question in the Fourth Amendment context have reached a contrary conclusion. *See Friedman v. Boucher*, 580 F.3d 847, 858 (9th Cir. 2009) (Nonconsensual DNA collection was an unreasonable search under the Fourth Amendment; no diminished expectation of

privacy exists because "Friedman was not on parole.  He had completed his term of supervised release successfully and was no longer the supervision of [sic] any authority."); *Trask v. Franco*, 446 F.3d 1036, 1043–44 (10th Cir. 2006) (holding that the plaintiff "enjoyed the full protection of the Fourth Amendment" because her probation had been discharged); *Moore v. Vega*, 371 F.3d 110, 116 (2d Cir. 2004) (stating that while parolees have diminished liberty interests, "[b]ecause plaintiff is not a parolee, she cannot be subjected to the same burdens upon her privacy"); *Doe v. Prosecutor*, 566 F. Supp. 2d 862, 883 (S.D. Ind. 2008) (declining to find a diminished expectation of privacy based upon a sex crime conviction, opining that "[a] person's status as a felon who is no longer under any form of punitive supervision therefore does not permit the government to search his home and belongings without a warrant"); *see also Park*, 305 Ga. at 354, 825 S.E.2d at 153 ("It cannot be said that an individual who has completed the entirety of his or her criminal sentence, including his or her parole and/or probation requirements, would have the same diminished privacy expectations as an individual who is *still* serving his or her sentence."); *State v. Ross*, 423 S.C. 504, 511–12, 815 S.E.2d 754, 757 (2018) (holding that lifetime SBM for a defendant not on probation and "no longer under the jurisdiction of the sentencing court" involves a different Fourth Amendment analysis than that applicable to a defendant who was on probation); *cf. Commonwealth v. Feliz*, 481 Mass. 689, 691, 119 N.E.3d 700, 704 (2019) (holding that Massachusetts's SBM

program, as applied to the particular defendant, a probationer, was an unconstitutional search under Article 14 of the Massachusetts Declaration of Rights).

While a person's status as a convicted sex offender may affect the extent to which the State can infringe upon fundamental rights, "the fact of 'diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.'" *Carpenter*, 138 S. Ct. at 2219 (quoting *Riley*, 134 S. Ct. at 2488). A person may have a lessened interest in the privacy of his address because he has already made that information public, or a lessened interest in the privacy of matters material to his voluntary participation in a certain activity, *e.g.*, *Vernonia*, 515 U.S. at 657 (discussing voluntary participation in school athletics), but having served his sentence, paid his debt to society, and had his rights restored, his expectation of privacy is not automatically and forever "significantly diminished" under the Fourth Amendment for all purposes. Instead, except as reduced for possessing firearms and by providing certain specific information and materials to the sex offender registry, defendant's constitutional privacy rights, including his Fourth Amendment expectations of privacy, have been restored.

### B. Character of the Intrusion Complained of

"Having considered the scope of the legitimate expectation of privacy at issue here, we turn next to the character of the intrusion that is complained of," which contemplates the "degree" of and "manner" in which the search intrudes upon legitimate expectations of privacy. *Id.* at 658. In that regard, we note first that the

trial court is required to order lifetime SBM, without any individual assessment of the offender or his offense characteristics, for individuals in the same category as defendant—that is, any unsupervised individual who meets the statutory definition of a "recidivist."

According to the State, "the duration of these searches *may be limited* since offenders ordered to enroll for life may petition to be removed after only one year." (Emphasis added.) (Citing N.C.G.S. § 14-208.43.) Yet this "[r]equest for termination" process does little to remedy what is absent at the front end of this warrantless search—that is, "the detached scrutiny of a" judicial officer "ensur[ing] an objective determination whether an intrusion is justified in any given case." *Skinner*, 489 U.S. at 622 (citation omitted). The termination requests are directed not to a judicial officer but the Post-Release Supervision and Parole Commission, which is furnished no meaningful criteria[16] for evaluating these requests other than the vague direction that "the Commission may terminate the monitoring requirement if the Commission finds that the person is *not likely to pose a threat to the safety of others*." N.C.G.S. § 14-208.43(c) (2017) (emphasis added). Given that defendant has been statutorily deemed to pose such a threat to the safety of others that he must maintain lifetime registration with the statewide registry, *id.* § 14-208.23, and is prohibited for the

---

[16] As stated above, the Commission may only consider termination of SBM "[i]f it is determined that the person has not received any additional reportable convictions during the period of satellite-based monitoring and the person has substantially complied with the provisions of this Article ["Sex Offender and Public Protection Registration Programs"]." N.C.G.S. § 14-208.43(c).

remainder of his life from being "[o]n the premises of any place intended primarily for the use, care, or supervision of minors, including, but not limited to, schools, children's museums, child care centers, nurseries, and playgrounds," *id.* § 14-208.18(a)(1) (2017), and from being "[o]n the State Fairgrounds during the period of time each year that the State Fair is conducted," *id.* § 14-208.18(a)(4) (2017), it would appear that few, if any, sex offenders are ever likely to satisfy that requirement. Indeed, this incongruity bears out in practice, as from the years 2010 through 2015, the Commission received sixteen requests for termination by individuals subjected to lifetime SBM and denied all of them.

The lack of judicial discretion in ordering the imposition of SBM on any particular individual and the absence of judicial review of the continued need for SBM is contrary to the general understanding that judicial oversight of searches and seizures, in the form of a warrant requirement, is an important check on police power. Indeed, the South Carolina Supreme Court has held that electronic monitoring under their state law " 'must be ordered by the court' only after the court finds electronic monitoring would not be an unreasonable search based on the totality of the circumstances presented in an individual case." *Ross*, 423 S.C. at 515, 815 S.E.2d at 759. Similarly, that Court also held that it was unconstitutional to impose lifetime satellite monitoring with no opportunity for judicial review, stating: "The complete absence of any opportunity for judicial review to assess a risk of re-offending, . . . is arbitrary and cannot be deemed rationally related to the legislature's stated purpose

of protecting the public from those with a high risk of re-offending." *State v. Dykes*, 403 S.C. 499, 508, 744 S.E.2d 505, 510 (2013) (citations omitted), *cert. denied*, 572 U.S. 1089 (2014). Thus, the fact that North Carolina's mandatory SBM program involves no meaningful judicial role is important in the analysis of the constitutionality of the program.

Mr. Grady, of course, must not only wear the half-pound ankle monitor at all times and respond to any of its repeating voice messages, but he also must spend two hours of every day plugged into a wall charging the ankle monitor. We cannot agree with the Court of Appeals that these physical restrictions,[17] which require defendant to be tethered to a wall for what amounts to one month out of every year, are "more inconvenient than intrusive." *Grady*, 817 S.E.2d at 25; *see T.L.O.*, 469 U.S. at 337 ("[E]ven a limited search of the person is a substantial invasion of privacy." (citing *Terry v. Ohio*, 392 U.S. 1, 24–25 (1967)).

Nor can we agree with the State that "[t]he physical intrusion here is minimal." The State, in reliance upon *Maryland v. King*, asserts: "Just as DNA swabbing is not

---

[17] The Supreme Court has made clear that any restrictions that accompany a search must be considered in evaluating the search's intrusiveness. *See Skinner*, 489 U.S. at 618 ("In view of our conclusion that the collection and subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches, we need not characterize the employer's antecedent interference with the employee's freedom of movement as an independent Fourth Amendment seizure. . . . For present purposes, it suffices to note that any limitation on an employee's freedom of movement that is necessary to obtain the blood, urine, or breath samples contemplated by the regulations must be considered in assessing the intrusiveness of the searches effected by the Government's testing program. (citing *United States v. Place*, 462 U.S. 696, 707–09 (1983))).

a significant intrusion beyond that associated with fingerprinting, so too SBM is not a significant intrusion beyond that associated with sex offender registration." In *King* the Court determined that, in comparison to the intrusions that accompanied valid arrests, including booking, photographing, fingerprinting, and a search of "the person and the property in his immediate possession," "including 'requir[ing] at least some detainees to lift their genitals or cough in a squatting position,' " *King*, 569 U.S. at 462 (alteration in original) (first quoting *United States v. Edwards*, 415 U.S. 800, 803 (1974); then quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 334 (2012)), the DNA swab—"[a] gentle rub along the inside of the cheek"—"involve[d] an even more brief and still minimal intrusion," *id.* at 463; *see also, e.g.*, *Vernonia*, 515 U.S. at 658 (concluding that the intrusion caused by the process of collecting samples for urinalysis was "*negligible*" where the "conditions [of doing so] are nearly identical to those typically encountered in public restrooms" (emphasis added)); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 448, 450–51 (1990) (concluding that the "measure of the intrusion on motorists stopped briefly at sobriety checkpoints—is *slight*" when the checkpoints involved "preliminary questioning and observation by checkpoint officers" and "[t]he average delay for each vehicle was approximately 25 seconds" (emphasis added)). In light of what we view as the substantial differences between, on the one hand, an individual having to register his address, photograph, and other limited details pertaining to himself and the offense or offenses for which he was convicted with the sheriff and, on the other hand, an individual being required to

wear an ankle appendage, which emits repeating voice commands when the signal is lost or when the battery is low, and which requires the individual to remain plugged into a wall every day for two hours, we cannot conclude, as the Court did in *King*, that "[t]he additional intrusion . . . is not significant" or that the SBM program "does not increase the indignity already attendant to" the sex offender registry. 569 U.S. at 459, 464; *see also Feliz*, 481 Mass. at 704, 119 N.E.3d at 713 (stating that "GPS monitoring . . . gathers much more information than" taking blood samples for a DNA database "and gathers this information over a much longer period of time. The experience of accommodating a device that remains attached to the body for a prolonged period of time differs materially from the one-time, minimal physical intrusion occasioned by a properly conducted DNA test.").

In our view, the physical intrusion accompanying SBM is distinct in its nature from that attendant upon sex offender registration. Notably, in considering whether Alaska's sex offender registration process constituted a retroactive punishment in violation of the Ex Post Facto Clause, the Supreme Court stated that the registration process "is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." *Smith v. Doe*, 538 U.S. 84, 99 (2003); *see id.* at 105 ("[T]he notification system is a passive one: An individual must seek access to the information."). With the ET-1 and its repeating voice commands, of course, an individual must "appear in public with some visible"—and audible—"badge of past criminality." *Id.* at 99.

In addition to the SBM program's physical intrusiveness, we also note the lifetime impingement upon defendant's expectation of privacy "in the whole of his physical movements." *Carpenter*, 138 S. Ct. at 2219. Numerous courts have recognized the intrusiveness of this aspect of SBM, which makes vast information about a person available to the State at the click of a mouse. The Court of Appeals majority stated, and we agree, that the SBM program's "continuous, warrantless search of defendant's location" by GPS technology is "uniquely intrusive." *Grady*, 817 S.E.2d at 25. As the D.C. Circuit observed:

> Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation. Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit, as does one's not visiting any of these places over the course of a month. The sequence of a person's movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story. A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups – and not just one such fact about a person, but all such facts.

*United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010) (footnote omitted), *aff'd sub nom. State v. Jones*, 565 U.S. 400. Simply put, GPS monitoring permits "a detailed chronicle of a person's physical presence compiled every day, every moment."

*Carpenter*, 138 S. Ct. at 2220. And even in an era in which GPS capabilities on cell phones are well known, society's expectation has been that such comprehensive and detailed information about an individual's movements would be private. *See Jones,* 565 U.S. at 430 (Alito, J., concurring in judgment). Compiling and maintaining a complete record of our every movement is "not what we expect anyone to do, and it reveals more than we expect anyone to know." *Maynard*, 615 F.3d at 563 (citation omitted).

In sum, in light of the physical intrusiveness of the ET-1, the quarterly equipment checks, and the extent to which GPS locational tracking provides an "intimate window" into an individual's "privacies of life," we conclude that the mandatory imposition of lifetime SBM on an individual in defendant's class works a deep, if not unique, intrusion upon that individual's protected Fourth Amendment interests.

II. Nature and Purpose of the Search

The balancing analysis that we are called upon to conduct here requires us to weigh the extent of the intrusion upon legitimate Fourth Amendment interests against the extent to which the SBM program sufficiently "promot[es] . . . legitimate governmental interests" to justify the search, thus rendering it reasonable under the Fourth Amendment. *Vernonia*, 515 U.S. at 652–53. In this aspect of the balancing test, we "consider the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." *Id.* at 660.

Our earlier conclusion that the nature of the State's concern was not "beyond the normal need for law enforcement" does not, of course, constitute a holding that the State's interest in solving crimes and facilitating apprehension of suspects so as to protect the public from sex offenders is not compelling. "Sexual offenses are among the most disturbing and damaging of all crimes, and certainly the public supports the General Assembly's efforts to ensure that victims, both past and potential, are protected from such harm." *Bowditch*, 364 N.C. at 353, 700 S.E.2d at 13 (Hudson, J., dissenting). Nonetheless, the question remains whether the SBM program's "*promotion* of legitimate governmental interests" outweighs "its intrusion on the individual's Fourth Amendment interests." *Vernonia*, 515 U.S. at 653 (emphasis added); *see King*, 569 U.S. at 461 ("[A] significant government interest does not alone suffice to justify a search. The government interest must outweigh the degree to which the search invades an individual's legitimate expectations of privacy.").

In its order, the trial court summarized portions of the testimony of the State's only witness, Mr. Pace. While this section of the order explains in some detail what the SBM does not prohibit or restrict, it does not address what, if anything, the evidence showed about how successfully the program advances its stated purpose of protecting the public from sex offenders. *See* N.C.G.S. § 14-208.5 ("[I]t is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the

exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article."). Although the trial court did not make any findings based upon Mr. Pace's testimony concerning the efficacy issue, Mr. Pace testified that wearing the SBM device will not prevent anyone from committing a crime, but that it could be a useful investigative tool if a crime has already been committed. According to Pace, unsupervised individuals in the SBM program like Grady are monitored by officers in Raleigh. Pace testified that while "officers are required by policy" in the case of supervised individuals to "trail their points three times a week," he was "not sure about unsupervised cases," stating, "All I know is the statute says that we have to monitor them." This is reflected in the DCC's Policy and Procedure Manual, which mandates that for supervised individuals, officers will "[r]eview points 3 times per week for patterns of movement indicating risk for re-offense and issues related to public safety" but contains no guidelines for the monitoring of unsupervised individuals.

The State did not present any evidence in the trial court regarding the recidivism rates of sex offenders. The State relies, as did the trial court, on the Supreme Court's decision in *McKune v. Lile*, in which the Court stated that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." 536 U.S. 23, 33 (2002) (plurality opinion) (first citing Crimes Against Children Research Ctr., Univ.

of N.H., *Fact Sheet 5; Sex Offenses* 24, 27; then citing Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 1983*, at 6 (1997)); *id.* at 34 (describing the "risk of recidivism" among sex offenders as "frightening and high"). Yet, the Supreme Court subsequently stated in *United States v. Kebodeaux* that while "[t]here is evidence that recidivism rates among sex offenders are higher than the average for other types of criminals," "[t]here is also conflicting evidence on the point." 570 U.S. 387, 395–96 (2013) (citations omitted). Aside from the fact that these statements are not evidence, the judicial statements upon which the trial court and the State rely are, when considered in their entirety, inconclusive.

At the hearing, defendant presented evidence tending to show that recidivism rates for sex offenders are lower than the recidivism rates for other offenders. For instance, defendant presented excerpts from reports of the North Carolina Sentencing and Policy Advisory Commission concerning "Offenders Placed on Probation or Released from Prison" for the years 2005–06, 2008–09, 2010–11, and 2013 which show that in North Carolina, "[s]ex offenders generally had lower recidivism rates than most groups." Defendant also presented an April 2014 "Special Report" from the Department of Justice, Bureau of Justice Statistics, studying "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010," which shows that "[a]mong violent offenders, the annual recidivism rates of prisoners sentenced for homicide or sexual assault were lower than those sentenced for assault or robbery across the 5-year period." Thus, the only actual evidence concerning the

threat posed by the recidivism of sex offenders tends to suggest that sex offender recidivism rates are not unusually high.

The lack of evidence in this case contrasts sharply with the record that the Supreme Court has examined and found sufficient in other Fourth Amendment contexts. For example, in *Vernonia* the Court reviewed extensive evidence of the importance of controlling drug use by students as well as particular facts about the crisis that existed in that school district, in which disciplinary actions had reached "epidemic proportions." *Vernonia*, 515 U.S. at 661–63. Similarly, in *Samson*, empirical evidence documented the recidivism rates of California's parolees. *Samson*, 547 U.S. at 853. These cases make clear that the extent of a problem justifying the need for a warrantless search cannot simply be assumed; instead, the existence of the problem and the efficacy of the solution need to be demonstrated by the government.

Our dissenting colleagues contend that we must defer to the General Assembly's legislative findings concerning the significance of the problem the SBM program is intended to address and the risk of sex offenders re-offending, as codified at N.C.G.S. § 14-208.5 (stating the "Purpose" of Article 27A), despite the absence of any record evidence supporting the State's position; however, legislative findings are entitled to only limited deference in determining the constitutionality of legislative enactments, *see Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 44, 175 S.E.2d 665, 673 (1970). Specifically, the Court in *Martin*, after quoting the relevant legislative findings, stated:

> If the constitutionality of a statute . . . depends on the existence or nonexistence of certain facts and circumstances, the existence of such facts and circumstances will generally be presumed for the purpose of giving validity to the statute, . . . if such a state of facts can reasonably be presumed to exist, and if any such facts may be reasonably conceived in the mind of the court. *This rule does not apply if the evidence is to the contrary, or if facts judicially known or proved, compel otherwise.*

*Id.* at 44, 175 S.E.2d at 673 (ellipsis in original) (emphasis added) (citation omitted));

*see also, e.g., Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) ("That

Congress' predictive judgments are entitled to substantial deference does not mean,

however, that they are insulated from meaningful judicial review altogether.  On the

contrary, we have stressed in First Amendment cases that the deference afforded to

legislative findings does 'not foreclose our independent judgment of the facts bearing

on an issue of constitutional law.' " (plurality opinion) (first quoting *Sable Commc'ns

of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989); then citing *Landmark Commc'ns, Inc.

v. Virginia*, 435 U.S. 829, 843 (1978)).  As we have already noted, in this case the only

evidence contained in the record fails to support the legislative findings as they are

characterized and relied upon by our dissenting colleagues.[18]

---

[18] The dissent further states that the legislature's "finding is supported by United States Supreme Court precedent."  In the same vein, the trial court relied upon *McKune*, as well as two cases from other jurisdictions, *Hallak* and *Belleau*, rather than the evidence presented at the hearing.  Yet, as we noted above, the Supreme Court subsequently observed in *Kebodeaux* that while "[t]here is evidence that recidivism rates among sex offenders are higher than the average for other types of criminals," "[t]here is also conflicting evidence on the point."  570 U.S. at 395–96.  Moreover, in *Samson*, while the Court relied on its prior decisions in concluding that "[t]he State's interests [in supervising parolees] . . . are

Aside from the inconsistency between the relevant legislative findings and the actual evidence contained in the record, the statement of purpose found in N.C.G.S. § 14-208.5, was enacted when the sex offender registration program was created in 1995 and retained as amended in 1997, and predates the creation of the SBM program in 2007. The extent to which this provision's findings relate specifically to SBM is limited, as evidenced by the statutory language, which contemplates the need to know where sex offenders live rather than the need for twenty-four hour real-time monitoring of their every movement. *See* N.C.G.S. § 14-208.5 (stating "that law enforcement officers[ ] . . . are impaired by the lack of information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction," that "[r]elease of information about these offenders will further the governmental interests of public safety," and that "it is the purpose of this Article to assist law enforcement . . . by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies"). Furthermore, while N.C.G.S. § 14-208.5 is relevant to, but not dispositive of, the "nature and immediacy of" the State's concern in protecting the public from

---

substantial," 547 U.S. at 853 (first citing *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998); then citing *Griffin*, 483 U.S. at 879; and then citing *United States v. Knights*, 534 U.S. 112, 121 (2001)), this did not end the inquiry. Rather, the Court also considered the available evidence and expressly concluded that "[t]he empirical evidence presented in this case *clearly demonstrates* the significance of these interests to the State of California." *Id.* (emphasis added). Here, in contrast to *Samson*, the empirical evidence before the trial court does not "clearly demonstrate[ ] the significance of" the State's interest in the continuous satellite-based monitoring of recidivist sex offenders. *Id.*

sex offenders, *Vernonia*, 515 U.S. at 660, the statute says absolutely nothing about the effectiveness of SBM in the "promotion of legitimate governmental interests," *id.* at 652–53. Thus, the legislative findings upon which our dissenting colleagues rely are not determinative of the outcome with respect to this constitutional issue.

The State also argues that the SBM program "is a useful investigative tool for law enforcement in solving crimes and excluding monitored offenders as suspects" and "speed[s] up apprehension of criminals before they commit additional crimes." The State did not present any empirical evidence demonstrating that the SBM program effectively advances this interest. Moreover, the State has not directed this Court to, nor are we aware of, a single instance dating back to the initial implementation of the SBM program in January 2007 in which the SBM program assisted law enforcement in apprehending or exonerating a suspected sex offender in North Carolina, or anywhere else. The State's inability to produce evidence of the efficacy of the lifetime SBM program in advancing any of its asserted legitimate State interests weighs heavily against a conclusion of reasonableness here.

The State also argues that the SBM program serves as an effective deterrent. Deterrence, of course, is one of "the two primary objectives of criminal punishment." *Kansas v. Hendricks*, 521 U.S. 346, 361–62 (1997). Because the SBM program is not a form of criminal punishment, but rather a "civil, regulatory scheme," "[t]he SBM program's foremost purpose is not to deter crime." *Bowditch*, 364 N.C. at 351–52, 700

S.E.2d at 12–13 (majority opinion).[19] Moreover, even if the State can permissibly justify the intrusive effects of the SBM program based on this "secondary effect," *id.* at 351, 700 S.E.2d at 12, the State has not presented any evidence demonstrating that the SBM program is effective at deterring crime.[20] Thus, the State's deterrence argument, like the other arguments it has advanced with respect to the efficacy issue, fails for lack of evidentiary support.

It is well established that the State bears the burden of proving the reasonableness of a warrantless search. *Coolidge*, 403 U.S. at 455. While the State's asserted interests here are without question legitimate, what this Court is duty bound to determine is whether the warrantless search imposed by the State on recidivists under the SBM program actually serves those legitimate interests. The State has the burden of coming forward with some evidence that its SBM program

---

[19] The dissent's contention that "the SBM program's primary purpose is to serve the special need of reducing sex crime recidivism through deterrence" directly contradicts the decision of the Court in *Bowditch*. 364 N.C. at 351–52, 700 S.E.2d at 12–13 (stating "[t]he SBM program's foremost purpose is not to deter crime").

[20] The dissent suggests that the efficacy of SBM as a deterrent is "self-evident." However, there is social science research that addresses this question. *See, e.g.*, Marc Renzema, *Evaluative research on electronic monitoring*, in *Electronically Monitored Punishment: International and critical perspectives*, 247, 247–70 (Mike Nellis, Kristel Beyens & Dan Kaminski eds., 2013) (summarizing all research available on the deterrent effect of electronic monitoring); Deeanna M. Button et al., *Using Electronic Monitoring to Supervise Sex Offenders: Legislative Patterns and Implications for Community Corrections Officers*, 20 Crim. Just. Pol'y Rev. 414, 418 (2009) (reporting that the most thorough review to date of research on electronic monitoring effectiveness concluded that "applications of electronic monitoring as a tool for reducing crime are not supported by existing data"). At an absolute minimum, we are not satisfied that unsupported assumptions of the type upon which our dissenting colleagues rely suffice to render an otherwise unlawful search reasonable.

assists in apprehending sex offenders, deters or prevents new sex offenses, or otherwise protects the public. Simply put, as the U.S. Supreme Court explained in *Ferguson v. City of Charleston*, "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." 532 U.S. 67, 86 (2001) (quoting *Edmond*, 531 U.S. at 42). Here, despite having the burden of proof, the State concedes that it did not present any evidence tending to show the SBM program's efficacy in furthering the State's legitimate interests. *Grady*, 817 S.E.2d at 27. We cannot simply assume that the program serves its goals and purposes when determining whether the State's interest outweighs the significant burden that lifetime SBM imposes on the privacy rights of recidivists subjected to it. *Cf. Doe v. Cooper*, 842 F.3d 833, 846 (4th Cir. 2016) ("[N]either anecdote, common sense, nor logic, in a vacuum, is sufficient to carry the State's burden of proof. Thus, while the State's argument may be conceptually plausible, it presented no evidence or data to substantiate it before the district court." (citing *United States v. Carter*, 669 F.3d 411, 418–19 (4th Cir. 2012))).

To be clear, the scope of North Carolina's SBM program is significantly broader than that of other states. Lifetime monitoring for recidivists is mandated by our statute for anyone who is convicted of two sex offenses that carry a registration requirement. A wide range of different offenses are swept into this category. For example, a court is required to impose lifetime SBM on an offender who twice attempts to solicit a teen under the age of sixteen in an online chat room to meet with

him, regardless of whether the person solicited was actually a teen or an undercover officer, or whether any meeting ever happened. *See* N.C.G.S. § 14-202.3 (2017); *State v. Fraley*, 202 N.C. App. 457, 688 S.E.2d 778, *disc. rev. denied*, 364 N.C. 243, 698 S.E.2d 660 (2010). Not only does the lifetime imposition of SBM vastly exceed the likely sentence such an offender would receive on a second offense, in addition, the State has simply failed to show how monitoring that individual's movements for the rest of his life would deter future offenses, protect the public, or prove guilt of some later crime.

Applying the correct legal standard to the record in this case, we conclude that the State has not met its burden of establishing the reasonableness of the SBM program under the Fourth Amendment balancing test required for warrantless searches. In sum, we hold that recidivists, as defined by the statute, do not have a greatly diminished privacy interest in their bodily integrity or their daily movements merely by being also subject to the civil regulatory requirements that accompany the status of being a sex offender. The SBM program constitutes a substantial intrusion into those privacy interests without any showing by the State that the program furthers its interest in solving crimes that have been committed, preventing the commission of sex crimes, or protecting the public. In these circumstances, the SBM program cannot constitutionally be applied to recidivists in Grady's category on a lifetime basis as currently required by the statute.

Conclusion

For the reasons stated, we hold that the application of the relevant portions of N.C.G.S. §§ 14-208.40A(c) and 14-208.40B(c) to individuals in the same category as defendant, under which these individuals are required to submit to a mandatory, continuous, nonconsensual search by lifetime satellite-based monitoring, violates the Fourth Amendment to the United States Constitution. The category to which this holding applies includes only those individuals who are not on probation, parole, or post-release supervision; who are subject to lifetime SBM solely by virtue of being recidivists as defined by the statute; and who have not been classified as a sexually violent predator, convicted of an aggravated offense, or are adults convicted of statutory rape or statutory sex offense with a victim under the age of thirteen. As applied to these individuals, the intrusion of mandatory lifetime SBM on legitimate Fourth Amendment interests outweighs the "promotion of legitimate governmental interests." *Vernonia*, 515 U.S. at 653.

The generalized notions of the dangers of recidivism of sex offenders, for which the State provided no evidentiary support, cannot justify so intrusive and so sweeping a mode of surveillance upon individuals, like defendant, who have fully served their sentences and who have had their constitutional rights restored. The unsupported assumption—that if a crime is committed at some unspecified point in the future, the ankle monitor worn during all of the intervening years by one of these individuals, who may or may not pose a risk, may potentially aid in inculpating or exonerating that individual—does not advance the State's interest in a manner that outweighs

the intrusiveness of mandatory lifetime SBM upon that individual's legitimate expectations of privacy. In contrast to the SBM provisions governing other offenders, which include an individualized "risk assessment" and judicial determinations regarding whether the individual "requires the highest possible level of supervision and monitoring," and, if so, for how long, N.C.G.S. §§ 14-208.40A(d)-(e), -208.40B(c); *see, e.g.*, *State v. Griffin*, 818 S.E.2d 336, 338–39, 342 (N.C. Ct. App. 2018) (explaining that at the bring back hearing, the State introduced a "Static-99," "an actuarial report designed to estimate the probability of sex offender recidivism, which placed Defendant in the 'moderate-low' category," noting, *inter alia*, that the defendant did not complete the SOAR sex offender treatment program while in prison, but reversing the trial court's imposition of thirty years of SBM),[21] the provisions governing recidivists present no opportunity for determinations by the court regarding what particular risk, if any, is posed by the individual and whether a particular duration of SBM will, in any meaningful way, serve the State's interest in combating that risk. We conclude that in such circumstances, the Fourth Amendment, which "secure[s] 'the privacies of life' against 'arbitrary power' " and "place[s] obstacles in the way of a too permeating police surveillance," *Carpenter*, 138 S. Ct. at 2214 (first quoting

---

[21] We refer to this case solely to illustrate how the SBM provisions for other offenders allow an opportunity for an individualized determination, whereas the SBM provisions that apply to the class of offenders at issue here provide none.

*Boyd*, 116 U.S. at 630; then quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)), prohibits the mandatory imposition of lifetime SBM on this class of individuals.

We note that the remedy we employ here is neither squarely facial nor as-applied. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995))); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321, 1341 (2000) (stating that "[t]here is no single distinctive category of facial, as opposed to as-applied, litigation" and "facial challenges are less categorically distinct from as-applied challenges than is often thought"). For instance, the statutory provisions authorizing lifetime SBM do not delineate between supervised and unsupervised offenders, nor do they specify the exact type of monitoring hardware that is to be used or what regulations the Division may adopt to administer the program and track monitored individuals. Our holding is as-applied in the sense that it addresses the current implementation of the SBM program and does not enjoin all of the program's applications or even all applications of the specific statutory provision we consider here (authorizing lifetime SBM based on a finding that an individual is a recidivist) because this provision is still

enforceable against a recidivist during the period of his or her State supervision and because our holding does not extend to a recidivist who also has been convicted of an aggravated offense, or is also an adult convicted of statutory rape or statutory sex offense with a victim under the age of thirteen, or is also a sexually violent predator. On the other hand, our holding is facial in that it is not limited to defendant's particular case but enjoins application of mandatory lifetime SBM to other unsupervised individuals when the SBM is authorized based solely on a "recidivist" finding that does not involve a sexually violent predator classification, an aggravated offense, or statutory rape or statutory sex offense with a victim under the age of thirteen by an adult.  Thus, our holding has both facial and as-applied characteristics. *See Doe v. Reed*, 561 U.S. 186, 194 (2010) (stating that the plaintiffs' claim "obviously has characteristics of both" as-applied and facial challenges).

Regardless, the Supreme Court has explained that "[t]he label is not what matters" and to the extent that a "claim and the relief that would follow . . . reach beyond the particular circumstances of" the party before the court, the party "must . . . satisfy our standards for a facial challenge to the extent of that reach."  *Id.* (citing *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)); *see, e.g.*, *Patel*, 135 S. Ct. at 2450–51 (explaining that a facial challenge requires that "no set of circumstances exists under which the [statute] would be valid," or in other words, "that a 'law is unconstitutional in all of its applications' " (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (alteration in original); then quoting *Wash. State Grange*,

552 U.S. at 449)). Here the "reach" of our holding extends to applications of mandatory lifetime SBM of unsupervised individuals authorized solely on a finding that the individual is a recidivist and without any findings that the individual was convicted of an aggravated offense, or is an adult convicted of statutory rape or statutory sex offense with a victim under the age of thirteen, or is a sexually violent predator. For the reasons stated, including the uncorroborated assertions regarding the extent of the general threat posed by the recidivism of sex offenders and the lack of any showing by the State that SBM effectively promotes its interest in combating that threat, the lack of any individualized assessment of the offender or his offense characteristics and of any meaningful opportunity for termination of SBM, and the unique intrusiveness of SBM upon legitimate privacy interests of recidivists, we conclude that no circumstances exist in which these applications would be valid.

The dissent takes issue with the facial aspect of our holding, contending that the Court must assess whether lifetime SBM can ever reasonably be applied to an individual who qualifies as a recidivist "in all circumstances," including the worst offenders such as sexually violent predators. According to the dissent, it must be established that "a statute could never constitutionally require enrollment of a defendant in lifetime SBM whose conduct meets the statutory definition of a recidivist." But the dissent mistakes the reach of our holding and contemplates circumstances beyond the applications of SBM we consider here. An inquiry into whether any statute, or any application of a statute, could permissibly require

enrollment in lifetime SBM of an individual who happens to qualify as a recidivist on some other basis is separate from an inquiry into whether these specific applications of the SBM program authorizing a lifetime search of individuals solely *because* they are recidivists are permissible—when considering, "the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*, 135 S. Ct. at 1371.

In *Patel* the Supreme Court explained that "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." 135 S. Ct. at 2451. The SBM statutes include multiple provisions authorizing lifetime warrantless searches, and here we address a limited application of one such provision. Specifically, we consider—and limit our holding to—a warrantless search of an unsupervised individual that is authorized based solely on a finding that the individual is a recidivist, with no finding (or even any record evidence) that the individual was convicted of an aggravated offense, or is an adult convicted of statutory rape or statutory sex offense with a victim under the age of thirteen, or is a sexually violent predator.[22] For the reasons discussed, the State has

---

[22] The dissent chides our decision for not investigating the "most heinous crimes" that also meet the statutory requirements of recidivists, such as aggravated offenses and sexually violent predators. We explicitly exclude such applications of SBM that are authorized based on these classifications from the extent of the reach of our remedy, which is concerned only with lifetime SBM authorized based solely on the fact that an individual is a recidivist. We decline to address whether the interests of the State and the individual with respect to sex

not established that this is a reasonable, categorical basis for the imposition of lifetime SBM under the Fourth Amendment. Thus, the warrantless search authorized by this application of the SBM program can never be reasonable, or, in other words, this portion of the "law is unconstitutional in all of its applications." *Id.* at 2451 (quoting *Wash. State Grange*, 552 U.S. at 449). The fact that, even with respect to this same defendant, there may potentially be *different* statutory provisions that, in considering "the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations," *Grady*, 135 S. Ct. at 1371, *may* constitutionally authorize a warrantless lifetime search—though we express no opinion on the validity of such searches at this time—is irrelevant because those searches do not involve applications of the specific statutory provision that we herein enjoin. *See Patel*, 135 S. Ct. at 2451 ("[T]he constitutional 'applications' that

---

offenders who commit these "most heinous crimes" would permissibly authorize mandatory lifetime SBM under the Fourth Amendment balancing test. Nonetheless, the dissent, in seeking to enlarge the scope of our holding, ventures outside of the record, considers background information regarding defendant's first conviction that was not presented to the trial court in this case, and then makes its own finding of fact that defendant's first conviction was an aggravated offense. While this off-shore fishing expedition is ultimately irrelevant because it involves information not properly before the Court, we note that it illustrates one of the flaws in the application we enjoin—that is, the mandatory imposition of lifetime SBM solely because an individual is a recidivist precludes any individualized assessment of the offender, in which the State could present, and the trial court could consider, other bases that may permissibly authorize the search when balancing "the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady*, 135 S. Ct. at 1371; *cf. Miller v. Alabama*, 567 U.S. 460, 489 (2012) (holding mandatory sentencing laws imposing life without parole on all juvenile homicide offenders "regardless of their age and age-related characteristics and the nature of their crimes" facially unconstitutional).

petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.").

We reach this decision mindful of our duty, "to declare the law unconstitutional in a proper case," which "cannot be declined," *S. Ry. Co. v. Cherokee County*, 177 N.C. 87, 88, 97 S.E. 758, 759 (1919), and also to "not undertake to pass upon the validity of the statute as it may be applied to factual situations materially different from that before it," *Bulova Watch Co.*, 285 N.C. at 472, 206 S.E.2d at 145 (citations omitted); *see also, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force or to sever its problematic portions while leaving the remainder intact." (first citing *United States v. Raines*, 362 U.S. 17, 20–22 (1960); then citing *United States v. Booker*, 543 U.S. 220, 227–29 (2005))). As this Court has previously explained, "[a] statute may be valid in part and invalid in part. If the parts are independent, or separable, but not otherwise, the invalid part may be rejected and the valid part may stand, provided it is complete in itself and capable of enforcement." *State v. Smith*, 265 N.C. 173, 179, 143 S.E.2d 293, 298 (1965) (quoting *Constantian v. Anson County*, 244 N.C. 221, 228, 93 S.E.2d 163, 168 (1956)); *see also Pope v. Easley*, 354 N.C. 544, 548, 556 S.E.2d 265, 268 (2001) (per curiam) ("[T]he inclusion of a severability clause within legislation will be interpreted as a clear statement of legislative intent to strike an

unconstitutional provision and to allow the balance to be enforced independently." (citing *Fulton Corp. v. Faulkner*, 345 N.C. 419, 421[–22], 481 S.E.2d 8, 9 (1997))). Given that other provisions of the SBM program can be enforced independently of the specific applications we enjoin here, and given the inclusion of a severability clause by the General Assembly in the SBM enabling legislation, *see* ch. 247, sec. 21, 2005 N.C. Sess. Laws (Reg. Sess. 2006) at 1085 ("The provisions of this act are severable. If any provision is held invalid by a court of competent jurisdiction, the invalidity does not affect other provisions of the act that can be given effect without the invalid provision."), we decline to address, and express no opinion on, the constitutionality of either the broader statutory framework or other provisions not implicated by the current appeal. Those provisions, as valid enactments of the General Assembly, are presumed to be constitutional and remain fully in effect. We are only ruling on the statute as currently written.

Thus, our decision today does not address whether an individual who is classified as a sexually violent predator, or convicted of an aggravated offense, or is an adult convicted of statutory rape or statutory sex offense with a victim under the age of thirteen may still be subjected to mandatory lifetime SBM—regardless of whether that individual is also a recidivist. N.C.G.S. §§ 14-208.40A(c), -208.40B(c). These applications of the SBM program are not before the Court at this time. Furthermore, we do not address whether an individual who has "committed an offense that involved the physical, mental, or sexual abuse of a minor" can be

subjected to SBM for a term of years specified by the court if, following a risk assessment by the Division, "the court determines that the offender does require the highest possible level of supervision and monitoring." *Id.* §§ 14-208.40A(d)-(e), -208.40B(c). Moreover, because our holding enjoins application only to unsupervised individuals, and because of the independent statutory provisions governing conditions for parole, post-release supervision, and probation, an individual who is a recidivist is still automatically subject to SBM during the period of State supervision. *See id.* §§ 15A-1374(b1) (2017) (stating that "[i]f a parolee is in a category described by G.S. 14-208.40(a)(1) . . . the [Post-Release Supervision and Parole] Commission must require as a condition of parole that the parolee submit to [SBM]"), -1368.4(b1)(6) (2017) (requiring that an individual "in the category described by G.S. 14-208.40(a)(1)" submit to SBM as a condition of post-release supervision), -1343(b2)(7) (2017) (mandating that an individual "described by G.S. 14-208.40(a)(1)" submit to SBM as a special condition of probation).

In sum, for the foregoing reasons we conclude that the Court of Appeals erred in limiting its holding to the constitutionality of the program as applied only to defendant, when the analysis of the reasonableness of the search applies equally to anyone in defendant's circumstances. Because we conclude that the relevant portions of N.C.G.S. §§ 14-208.40A(c) and 14-208.40B(c) are unconstitutional as applied to all individuals in the category herein described, we modify and affirm the decision of the Court of Appeals.

MODIFIED AND AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

The Supreme Court of the United States held that the North Carolina statutory scheme for satellite-based monitoring (SBM) of a limited class of sex offenders effected a Fourth Amendment search and remanded this case for consideration of whether the search was reasonable. As the Supreme Court stated, "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *Grady v. North Carolina*, 135 S. Ct. 1368, 1371, 191 L. Ed. 2d 459, 462 (2015) (per curiam). For guidance, the Supreme Court provided two examples of categorical searches which specifically addressed the reasonableness inquiry. *Id.* at 1371, 191 L. Ed. 2d at 462–63 (citing *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995)). This case raises substantial competing interests: the State's interest in protecting children from sexual abuse and an individual's right to privacy from government monitoring. The Fourth Amendment's reasonableness test requires balancing these interests to determine whether the government's SBM is a reasonable search of this limited class of sex offenders.

Using the remand as an opportunity to make a broad policy statement, the majority, though saying it addresses only one statutory classification, recidivist,

applies an unbridled analysis which understates the crimes, overstates repeat sex offenders' legitimate expectations of privacy, and minimizes the need to protect society from this limited class of dangerous sex offenders. The majority's sweeping opinion could be used to strike down every category of lifetime monitoring under the SBM statute.

The majority appears to pick and choose between the characteristics of as-applied and facial challenges in finding a statute wholly unconstitutional. Nonetheless, its analysis does not support its conclusion that the statute is unconstitutional, either facially or as applied to this defendant. Its approach does not consider the specific facts of this defendant's convictions and improperly classifies this defendant's crimes under the statute. Creating an "as-applied" category not found in the statute, the majority fails to conduct the proper constitutionality inquiry, which requires it to consider lifetime SBM for the highest risk sex offender that falls within the statute's recidivist category. To reach its result, the majority minimizes and mischaracterizes the heinous crimes committed by defendant and others covered by the statute and diminishes the State's significant interest in protecting its citizens. The majority usurps the role of the legislature, denying the legislature's findings of the significance of this societal problem and rejecting the efficacy of its solution. Further, it rejects the facts found by the trial court and finds its own.

Here defendant's crimes of sexually assaulting children on two occasions make him a member of two statutory classes of sex offenders—aggravated offenders and

recidivists—whom the General Assembly has determined to be among the most dangerous to society. Sex offenders who target children pose a unique threat to public safety, and the State's interest in protecting children from sexual assault is paramount. Sadly, these despicable crimes targeting vulnerable children are on the rise. The General Assembly carefully crafted a regulatory framework to protect the public by deterring sexual violence. To accomplish this purpose, the statute provides lifetime SBM for only a small group of the worst sex offenders. While courts must continue to carefully review the government's intrusions upon reasonable privacy interests as search technology develops, here the State's paramount interest outweighs the State's intrusion into defendant's diminished Fourth Amendment privacy interests. Because the SBM program is constitutional, both facially and as applied to defendant, I respectfully dissent.

## I. Facts and Procedural History

Defendant's crimes qualify him as an aggravated sex offender and a violent recidivist under the statutory framework.[1] On 10 May 1996, defendant, then aged seventeen, committed a sexual assault involving anal sex on a seven-year-old boy while the victim's younger brother watched. Defendant was charged with first-degree sexual offense and taking indecent liberties with children. On 16 January 1997, he

---

[1] Because defendant's status as a recidivist was uncontested, neither party fully developed the record as to the other lifetime SBM categories applicable to defendant's crimes.

pled no contest to a second-degree sex offense, defined as "engag[ing] in a sexual act . . . by force and against the will of the other person," and received a sentence of seventy-two to ninety-six months. N.C.G.S. § 14-27.5(a) (2013) (current version at *id.* § 14-27.27(a) (Supp. 2018)).

On 5 August 2002, defendant was released from prison. Only seventeen months later on 6 January 2004, defendant was convicted of not having registered as a sex offender. The trial court suspended his twenty-one to twenty-six month sentence and ordered thirty-six months of probation. On 21 September 2004, defendant received notice of multiple probation violations, and after a hearing, the trial court granted defendant another chance by placing him on intensive supervision on 16 December 2004. On 23 February 2005, however, defendant's probation was revoked because of additional probation violations, and the trial court reinstated defendant's active sentence.

Beginning in January 2005, before the revocation of his probation and while under intensive supervision, defendant, then aged twenty-six, engaged in an illegal sexual relationship with and impregnated a fifteen-year-old girl. On 13 September 2006, defendant pled guilty to taking indecent liberties with a child, and the State dismissed a statutory rape charge. Defendant received and served a sentence of thirty-one to thirty-eight months. The Department of Correction (DOC) unconditionally discharged defendant on 25 January 2009.

On 12 March 2010, DOC sent defendant a letter giving notice of defendant's upcoming SBM determination hearing. Before that hearing could take place, however, defendant was arrested on 16 July 2010 for again failing to properly comply with the sex offender registry requirements. On 27 October 2010, defendant pled guilty and this time received a sentence of twenty-four to twenty-nine months. Defendant was released from prison on 24 August 2012, and on 14 May 2013, the trial court conducted defendant's SBM determination hearing and concluded that defendant's two sex crimes were "sexually violent offenses" and that defendant met the criteria for a recidivist sex offender.[2] *See id.* § 14-208.6(2b), (5) (Supp. 2018). As required by statute, the trial court ordered defendant to enroll in lifetime SBM. *See id.* § 14-208.40B(c) (2017). Significantly, since enrolling in SBM more than six years ago, defendant has not been charged with any additional offenses.

Defendant appealed the SBM order, and the Court of Appeals affirmed the trial court order. *State v. Grady*, 233 N.C. App. 788, 759 S.E.2d 712, 2014 WL 1791246, at *2–3 (2014) (unpublished). Upon further appeal to the United States Supreme Court, defendant asserted enrollment in lifetime SBM violates the Fourth Amendment.

---

[2] Though not addressed by the trial court, defendant's conviction for anally penetrating a seven-year-old boy constitutes an "aggravated offense" under the statute, providing an alternate and independent ground for imposing lifetime SBM. *See* N.C.G.S § 14.208.6(1a) (Supp. 2018) (An "[a]ggravated offense" is "[a]ny criminal offense that includes . . . engaging in a sexual act involving vaginal, anal, or oral penetration with a victim who is less than 12 years old."). That defendant is an aggravated offender is a conclusion of law, not a finding of fact, because the underlying facts of and conviction for the assault that satisfy the statutory criteria were previously found by a trial court.

Concluding that continuous satellite-based location monitoring effects a Fourth Amendment search, the Supreme Court vacated the lower court's judgment and remanded this case to our Court to "examine whether the State's monitoring program is reasonable" under the Fourth Amendment. *Grady*, 135 S. Ct. at 1371, 191 L. Ed. 2d at 463.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV.

> The Fourth Amendment prohibits only unreasonable searches. The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations. *See, e.g.*, *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) (suspicionless search of parolee was reasonable); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) (random drug testing of student athletes was reasonable).

*Grady,* 135 S. Ct. at 1371, 191 L. Ed. 2d at 462–63. The Supreme Court's remand mandate instructed this Court to determine whether lifetime SBM is a reasonable search for those classified as the most dangerous sex offenders. "[W]e 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Samson*, 547 U.S. at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256 (second alteration in original) (quoting *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 591, 151 L. Ed. 2d 497, 505 (2001)). This

examination must consider the government's purpose in conducting the search and the nature of the search balanced with the degree of intrusion upon the recognized privacy interest. *See Grady*, 135 S. Ct. at 1371, 191 L. Ed. 2d at 462–63. In assessing reasonable expectations of privacy, "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' What expectations are legitimate varies, of course, with context." *Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391, 132 L. Ed. 2d at 575 (citing and quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337–38, 105 S. Ct. 733, 740–41, 83 L. Ed. 2d 720, 731–32 (1985)).

By citing *Samson* and *Vernonia*, the Supreme Court suggested that both the general reasonableness test and special needs doctrine are pertinent in evaluating the reasonableness of the SBM statute. *See Samson*, 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L. Ed. 2d at 259 n.3 (applying a general reasonableness test); *Vernonia*, 515 U.S. at 653, 115 S. Ct. at 2391, 132 L. Ed. 2d at 574 (applying the special needs doctrine). Though involving different criteria, both analyses require the balancing test specified in the remand order to determine whether the statute at issue here is valid. *See Samson*, 547 U.S. at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256; *Vernonia*, 515 U.S. at 652–53, 115 S. Ct. at 2390, 132 L. Ed. 2d at 574.

In *Samson* the Supreme Court applied "general Fourth Amendment principles" to evaluate the reasonableness of a statute that required parolees to agree to any warrantless search, without cause, at any time. 547 U.S. at 846, 853 n.3, 126

S. Ct. at 2196, 2200 n.3, 165 L. Ed. 2d at 255, 260 n.3. The Supreme Court evaluated the search's reasonableness "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256 (quoting *Knights*, 534 U.S. at 118–19, 122 S. Ct. at 591, 151 L. Ed. 2d at 505). The Supreme Court first concluded that parolees "have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259. Then viewing that diminished privacy in the totality of the circumstances, the Supreme Court concluded the warrantless search did not intrude upon "an expectation of privacy that society would recognize as legitimate," despite the unlimited breadth of the right to search and regardless of the crime of conviction. *Id.* at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259. Therefore, balancing no intrusion upon any reasonable expectation of privacy against the State's substantial interests in deterring recidivism, the Supreme Court found the statute constitutional under the Fourth Amendment. *Id.* at 853, 857, 126 S. Ct. at 2200, 2202, 165 L. Ed. 2d at 259–60, 262.

In *Vernonia* the Supreme Court applied the same balancing test for a warrantless search "when special needs, beyond the normal need for law enforcement, ma[d]e the warrant . . . requirement impracticable." 515 U.S. at 653, 115 S. Ct. at 2391, 132 L. Ed. 2d at 574 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 3168, 97 L. Ed. 2d 709, 717 (1987)). A school policy required that

high school athletes consent to random drug screenings in order to participate in school athletics. *Id.* at 650, 115 S. Ct. at 2389, 132 L. Ed. 2d at 572. The Court determined that student athletes had diminished expectations of privacy because the school had a special relationship with the students (*in loco parentis*) and because "[p]ublic school locker rooms [where the drug screenings take place] . . . are not notable for the [bodily] privacy they afford." *Id.* at 655–57, 115 S. Ct. at 2391–93, 132 L. Ed. 2d at 575–77. Next, the Court examined the intrusion upon privacy by the drug screening process and determined it had a "negligible" effect on the defendant's privacy interests. *Id.* at 658, 115 S. Ct. at 2393, 132 L. Ed. 2d at 578. Moreover, the State's important interest in deterring drug use among teenagers, particularly for the narrow, at-risk category of student athletes, justified the search under a Fourth Amendment reasonableness analysis. *Id.* at 661–62, 665, 115 S. Ct. at 2395, 2397, 132 L. Ed. 2d at 579–80, 582.

On remand in the present case, this Court further remanded this matter to the trial court to proceed according to the United States Supreme Court's mandate. The trial court held a new hearing on 16 June 2016. The State introduced evidence that defendant's GPS ankle monitor weighs less than nine ounces. The monitor holds a charge for about three days, but offenders are encouraged to charge the monitor two hours per day. A "beacon" set up in defendant's home helps preserve the monitor's battery life when defendant is in the beacon's range. A probation officer reviews the monitor and the beacon every three months to ensure the equipment is operating

correctly. Unsupervised offenders, like defendant, have no direct contact with probation officers except for quarterly reviews. The monitor provides continuous location tracking of defendant. The SBM system displays defendant's location information as a series of points with arrows that are overlaid onto a map, and a probation officer can view the information as a still image or an image in motion. Officers have access to defendant's live location as well as historic location data for the preceding six months. As of 30 June 2015, only two probation officers were responsible for monitoring the data from over five hundred unsupervised offenders.

In its order, the trial court again determined that defendant's crimes were "sexually violent offenses," which required him to register as a sex offender, and that he was a recidivist, which met the criteria for lifetime SBM. In assessing the reasonableness of the search, the trial court noted the State's evidence characterizing the ankle monitor as small, nonintrusive, and "not prohibit[ing] any defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes." The trial court found that "[t]he ankle monitor does not monitor or reveal the activities of the offender—it merely monitors his location."

While the trial court noted defendant's submission of the State's policies governing SBM and multiple studies of recidivism rates, it found persuasive the long line of United States Supreme Court decisions acknowledging the special threat of repeat sex offenders. The trial court stated:

The United States Supreme Court has long recognized the dangers of recidivism in cases of sex offenders. *Smith v. Doe*, 538 U.S. 84, 103 (2003) ("The risk of recidivism posed by sex offenders is frightening and high."); *McKune v. Lile*, 536 U.S. 24, 34 (2002) ("[s]ex offenders are a serious threat [ ] in this nation . . . . When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."). Additionally, it is within the purview of state governments to recognize and reasonably react to a known danger in order to protect its citizens. *Samson v. California*, 547 U.S. 843, 848 (2006) ("This Court has acknowledged the grave safety concerns that attend recidivism" and "the Fourth Amendment does not render the States powerless to address these concerns <u>effectively</u>.").

(second alteration in original). Ultimately, the trial court concluded "that based on the totality of the circumstances . . . [SBM] of the defendant is a reasonable search. The Court has considered the defendant's argument that the [SBM] statute is facially unconstitutional. The Court rejects this argument and finds that the statute is constitutional on its face."[3]

When substantial and immediate harm threatens children, a State may take proactive, programmatic measures to prevent that harm. *See Bd. of Educ. v. Earls*,

---

[3] At the various stages throughout the appellate process, it has been unclear whether defendant is making a facial or an as-applied challenge. Generally, it appears defendant has asserted a facial challenge or has attempted to articulate a hybrid of facial and as-applied challenges. On remand from the United States Supreme Court, the trial court explicitly found the statute to be constitutional on its face, thereby indicating that defendant's argument, at least as understood by the trial court, was that the statute was facially unconstitutional. The Court of Appeals, however, held that the State failed to meet its evidentiary burden that the statute was reasonable as applied to defendant. *See State v. Grady*, 817 S.E.2d 18, 28 (N.C. Ct. App. 2018). Defendant argues both facial and as-applied invalidity in his brief here.

536 U.S. 822, 835–38, 122 S. Ct. 2559, 2567–69, 153 L. Ed. 2d 735, 747–49 (2002); *Vernonia*, 515 U.S. at 658 n.2, 115 S. Ct. at 2393 n.2, 132 L. Ed. 2d at 578 n.2 (noting the search at issue was a "prophylactic" "blanket search" designed to protect students and deter drug use). The General Assembly has clearly stated the purpose of North Carolina's "Sex Offender and Public Protection Registration Programs" is to proactively protect children and others from dangerous sex offenders:

> The General Assembly recognizes that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest.
>
> The General Assembly also recognizes that persons who commit certain other types of offenses against minors . . . pose significant and unacceptable threats to the public safety and welfare of the children in this State and that the protection of those children is of great governmental interest. Further, the General Assembly recognizes that law enforcement officers' efforts to protect communities, conduct investigations, and quickly apprehend offenders who commit sex offenses or certain offenses against minors are impaired by the lack of information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction. . . .
>
> Therefore, it is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.

N.C.G.S. § 14-208.5 (2017).

Likewise, the United States Supreme Court has recognized that " 'sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people.' And it is clear that a legislature 'may pass valid laws to protect children' and other victims of sexual assault 'from abuse.' " *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736, 198 L. Ed. 2d 273, 281 (2017) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244–45, 122 S. Ct. 1389, 1399, 152 L. Ed. 2d 403, 417 (2002)). Furthermore, " '[t]he victims of sex assault are most often juveniles,' and '[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault.' " *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4, 123 S. Ct. 1160, 1163, 155 L. Ed. 2d 98, 103 (2003) (quoting *McKune v. Lile*, 536 U.S. 24, 32–33, 122 S. Ct. 2017, 2024, 153 L. Ed. 2d 47, 56–57 (2002) (plurality opinion)). The Supreme Court has emphasized the magnitude of the harm inflicted upon victims, noting a sexual assault on a child "has a permanent psychological, emotional, and sometimes physical impact on the child." *Kennedy v. Louisiana*, 554 U.S. 407, 435, 128 S. Ct. 2641, 2658, 171 L. Ed. 2d 525, 548 (2008) (citations omitted); *see also id.* at 467–68, 128 S. Ct. at 2676–77, 171 L. Ed. 2d at 568–69 (Alito, J., dissenting) (discussing the long-term developmental problems sexually abused children can experience (citations omitted)).

Thus, the General Assembly has determined violent sex offenders should be deterred from committing additional sex offenses. To further its paramount interest in protecting the public—especially children—from sex offenders, the General Assembly enacted various programs to monitor and deter sex offenders after their release. For example, "North Carolina, like every other state in the nation, enacted a sex offender registration program to protect the public from the unacceptable risk posed by convicted sex offenders." *State v. Bryant*, 359 N.C. 554, 555, 614 S.E.2d 479, 480 (2005), *superseded on other grounds by statute*, An Act to Protect North Carolina's Children/Sex Offender Law Changes, Ch. 247, Sec. 8.(a), 2005 N.C. Sess. Laws (Reg. Sess. 2006) 1065, 1070. *See generally Smith v. Doe*, 538 U.S. 84, 103, 123 S. Ct. 1140, 1145, 155 L. Ed. 2d 164, 174–75 (2003). Similarly, with the encouragement of Congress, forty-eight states and the District of Columbia have electronic monitoring available for some sex offenders.[4] *See* 42 U.S.C. § 16981 (2012) (current version at 34

---

[4] *See* 28 C.F.R. § 2.204(b)(2)(iii) (2018) (permitting electronic tracking in Washington, D.C.); Ala. Code § 15-20A-20 (LexisNexis 2018); Alaska Stat. § 12.55.027(d), (g)(3) (2018); Ariz. Rev. Stat. Ann. § 13-902(G) (Supp. 2018); Ark. Code Ann. § 12-12-923 (2016); Cal. Penal Code § 3004(b) (West Supp. 2019); Colo. Rev. Stat. §§ 18-1.3-204(2)(a)(XIV.5), -1007(2) (2018); Conn. Gen. Stat. Ann. § 53a-30(a)(14) (West Supp. 2019); Del. Code Ann. tit. 11, § 4121(u) (2015); Fla. Stat. Ann. § 948.30(2)-(3) (West Supp. 2019); Ga. Code Ann. § 42-1-14(e) (Supp. 2017); Haw. Rev. Stat. Ann. § 706-624(2)(p) (LexisNexis Supp. 2018); Idaho Code § 18-8308(3) (2016); 730 Ill. Comp. Stat. Ann. 5/5-8A-6 (West Supp. 2019); Ind. Code Ann. § 11-13-3-4(j) (LexisNexis Supp. 2018); Iowa Code Ann. § 692A.124(1) (West 2016); Kan. Stat. Ann. § 22-3717(u) (Supp. 2018); La. Stat. Ann. § 15:560.4(A) (2012); Me. Rev. Stat. Ann. tit. 17-A, § 1204(2-A)(N) (Supp. 2018); Md. Code Ann., Crim. Proc. § 11-723(d)(3)(i) (LexisNexis 2018); Mass. Ann. Laws ch. 265, § 47 (LexisNexis Supp. 2019); Mich. Comp. Laws Ann. § 750-520n(1) (West Supp. 2019); Minn. Stat. Ann. § 609.135(5a)(b)(8), (5a)(c) (West 2018); Miss. Code Ann. § 99-19-84 (2015); Mo. Ann.

U.S.C.A. § 20981 (West 2017)) (authorizing grants to states that implement twenty-four-hour, continuous GPS monitoring programs for sex offenders).

North Carolina's "sex offender monitoring program . . . uses a continuous satellite-based monitoring system" for narrowly and categorically defined classes of sex offenders who present a significant enough threat of reoffending to "require[ ] the highest possible level of supervision and monitoring." N.C.G.S. § 14-208.40(a) (2017). The four categories of offenders who require continuous lifetime SBM to protect public safety are (1) sexually violent predators, (2) recidivists, (3) aggravated offenders, and (4) adults convicted of statutory rape or a sex offense with a victim under the age of thirteen. *Id.* § 14-208.40A(c) (2017). A "sexually violent predator" is a person who "has been convicted of a sexually violent offense," such as rape or incest, and "who suffers from a mental abnormality or personality disorder," as determined by a board of experts, that makes the person likely to purposely foster relationships

Stat. § 217.735(4) (West Supp. 2019); Mont. Code Ann. § 46-18-206 (2017); Neb. Rev. Stat. Ann. § 83-174.03(4)(g) (LexisNexis 2019); Nev. Rev. Stat. Ann. § 176A.410(2)(b) (LexisNexis 2016); N.H. Rev. Stat. Ann. § 651:2(V)(b) (LexisNexis Supp. 2018); N.J. Stat. Ann. § 30:4-123.92 (West 2008); N.M. Stat. Ann. § 31-21-10.1(E) (Supp. 2018); N.Y. Penal Law § 65.10(4), (5-a) (McKinney Supp. 2019); N.C.G.S. § 14-208.40A(c) (2017); N.D. Cent. Code § 12.1-32-07(3)(f) (Supp. 2017); Ohio Rev. Code Ann. § 2929.13(L) (West Supp. 2019); Okla. Stat. Ann. tit. 22, § 991a(A)(12) (West Supp. 2019); Or. Rev. Stat. § 144.103(2)(c) (2017); 42 Pa. Stat. and Cons. Stat. Ann. § 9799.30 (West 2014); 11 R.I. Gen. Laws § 11-37-8.2.1 (Supp. 2018); S.C. Code Ann. § 23-3-540 (Supp. 2018); S.D. Codified Laws § 24-15A-24 (2013); Tenn. Code Ann. § 40-39-303 (Supp. 2018); Tex. Code Crim. Proc. Ann. art. 42A.301(b)(16) (West 2018); Utah Code Ann. § 77-18-1(8)(d) (LexisNexis Supp. 2018); Va. Code Ann. § 19.2-303 (2015); Wash. Rev. Code Ann. § 9.94A.704(5)(b) (West 2019); W. Va. Code Ann. § 62-11D-3(a) (LexisNexis 2014); Wis. Stat. Ann. § 301.48 (West 2019); Wyo. Stat. Ann. § 7-13-1102(b)(i) (2017).

with the intent of sexual victimization or to engage in sexually violent offenses against strangers. *Id.* §§ 14-208.6(5)-(6), -208.20 (2017 & Supp. 2018). Second, "recidivists" have had at least two "reportable convictions." *Id.* § 14-208.6(2b). Reportable convictions are serious crimes, including "sexually violent offenses" and various "offense[s] against a minor," such as kidnapping. *Id.* § 14-208.6(1m), (4)(a) (Supp. 2018). Third, perpetrators of aggravated offenses have convictions for "engaging in a sexual act involving vaginal, anal, or oral penetration" either (1) through use or threat of force or (2) with a child under twelve years old. *Id.* § 14-208.6(1a) (Supp. 2018). The fourth category includes convictions of any sex act by a person over eighteen years old against any victim under thirteen years old. *Id.* § 14-27.28 (2017).

In short, mandatory SBM applies only to a small subset of individuals who commit the most serious sex crimes or are repeat offenders. The General Assembly has determined certain convicted sex offenders—namely sexually violent predators, recidivists, perpetrators of aggravated offenses, and adults who sexually victimize children under thirteen years old—"pose a high risk of engaging in sex offenses even after being released from incarceration . . . and that protection of the public from sex offenders is of paramount governmental interest." *Id.* § 14-208.5. Accordingly, the statute categorically requires the trial court to "order the offender to enroll in a satellite-based monitoring program for life." *Id.* § 14-208.40A(c). Though the program is commonly referred to as "lifetime" monitoring, one year after a defendant completes

-16-

his sentence, probation, or parole, the defendant may petition the Post-Release Supervision and Parole Commission for termination of enrollment. *Id.* §§ 14-208.41(a), -208.43 (2017). The defendant must show he has not been convicted of any additional qualifying convictions, has substantially complied with the SBM and registration programs, and "is not likely to pose a threat to the safety of others." *Id.* § 14-208.43(c).

## II. The Majority's Holding

The majority "hold[s] that the application of the relevant portions of N.C.G.S. §§ 14-208.40A(c) and 14-208.40B(c) to individuals in the same category as defendant, under which these individuals are required to submit to a mandatory, continuous, nonconsensual search by lifetime satellite-based monitoring, violates the Fourth Amendment to the United States Constitution. The category to which this holding applies includes only those individuals who are not on probation, parole, or post-release supervision; who are subject to lifetime SBM solely by virtue of being recidivists as defined by the statute; and who have not been classified as a sexually violent predator, convicted of an aggravated offense, or are adults convicted of statutory rape or statutory sex offense with a victim under the age of thirteen." Thus, the majority "conclude[s] that the Court of Appeals erred in limiting its holding to the constitutionality of the program as applied only to defendant, when the analysis of the reasonableness of the search applies equally to anyone in defendant's circumstances."

It is undisputed that defendant is a recidivist. To qualify as a recidivist under the statute, a defendant must have multiple "reportable convictions." *Id.* § 14-208.6(2b). For example, reportable convictions include comparatively minor sex crimes where the victim is not physically harmed, such as secretly photographing a person for the purpose of gratifying sexual desires (a Class I felony) or solicitation of a child using a computer to commit a sex act (a Class H felony), as well as those society would consider as the worst sex crimes, such as first-degree forcible rape (a Class B1 felony) and child sex trafficking (a Class B2 felony). *See id.* § 14-208.6(4)(a), (d). If a defendant is convicted of at least two reportable offenses, he qualifies as a recidivist, and the trial court must order the defendant's enrollment in lifetime SBM. Considering the various crimes within the statute's purview, a proper constitutional analysis requires an understanding of the distinction between a facial challenge to the statute and a challenge only as applied to defendant. An as-applied challenge would maintain that the statute is overly broad by including defendant within the recidivist classification, whereas a facial challenge asserts that the statute operates unconstitutionally as to all possible defendants who qualify as recidivists.

The majority holds SBM for any unsupervised defendant falling within the recidivist category is unconstitutional without stating why its analysis applies precisely, but only, to those in this category. Despite its holding, the majority's logic seems to concede the SBM statute's constitutionality. Like those crimes of many other violent sex offenders, defendant's crimes fit two statutory categories: recidivist and

aggravated offender. The majority suggests that SBM is unconstitutional for the recidivist category but not for the aggravated offender. Concluding SBM is constitutional for an aggravated offender who is also a recidivist undermines the holding that the entire recidivist category is unconstitutional.

## III. Reasonableness As Applied to Defendant

An as-applied challenge concedes a statute's general constitutionality but instead "claim[s] that a statute is unconstitutional on the facts of a particular case or in its application to a particular party." *As-Applied Challenge*, *Black's Law Dictionary* (10th ed. 2014). The majority fails to conduct such an analysis. Instead of focusing on the individualized facts of defendant's case as required by an as-applied challenge, the majority generally uses defendant's "circumstances" to create its category encompassing all unsupervised recidivist sex offenders, regardless of the individual offenses represented. *Cf. Graham v. Florida*, 560 U.S. 48, 91–96, 130 S. Ct. 2011, 2039–42, 176 L. Ed. 2d 825, 856–60 (2010) (Roberts, C.J., concurring in judgment) (promoting a fact-based, instead of a categorical, approach for as-applied challenges). Thus, the majority facially strikes down N.C.G.S. § 14-208.40A(b)(ii) and related provisions that require lifetime SBM for recidivists. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457–58, 192 L. Ed. 2d 435, 453 (2015) (Scalia, J., dissenting) (remarking that "the *reasoning* of a decision may suggest that there is no permissible application of a particular statute . . . . [and] in this sense, the facial invalidation of a statute is a logical consequence of the Court's opinion, [even if it is] not the immediate

effect of its judgment" (citation omitted)). An as-applied challenge should focus on the specific facts underlying a defendant's convictions, and a defendant's as-applied challenge fails if the defendant's conduct is the targeted harm the General Assembly intended to curtail. *See Bryant*, 359 N.C. at 565, 614 S.E.2d at 486 (stressing that "the role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests" and that "[t]he role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials" (quoting *Henry v. Edmisten*, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986))). If, however, the statute is overly broad as applied to defendant's specific circumstances, the statute is unconstitutional as applied to him. *See Britt v. State*, 363 N.C. 546, 549–50, 681 S.E.2d 320, 322–23 (2009).

In *Britt* this court analyzed an as-applied challenge to a new statute that prohibited the plaintiff from owning a firearm because of his nonviolent, drug-related felony conviction decades earlier. *Id.* at 547, 681 S.E.2d at 321. The plaintiff complied with the statute and then challenged its constitutionality as applied to him. *Id.* at 548–49, 681 S.E.2d at 322. After noting his longstanding law-abiding history and, when allowed, his lawful and peaceful possession of firearms, this Court restored the plaintiff's right to possess a firearm. *Id.* at 550, 681 S.E.2d at 323 ("[I]t is unreasonable to assert that a nonviolent citizen who has responsibly, safely, and legally owned and used firearms for seventeen years is in reality so dangerous that any possession at all of a firearm would pose a significant threat to public safety.").

In other words, by examining both the plaintiff's previous conviction and subsequent actions, this Court determined that the statute was overly broad and thus unconstitutional as applied to the plaintiff.

Here the statute is not overly broad as applied to defendant because it appears he, as a consequence of his aggravated and repeated sex crimes, poses exactly the public danger the legislature sought to address. He forcibly sodomized a seven-year-old boy with another child watching and, as a result, spent six years in prison. Upon release, defendant failed to register as a sex offender and was placed on probation. He received notice of multiple probation violations, and after a hearing, the trial court gave defendant a second chance by placing him on intensive supervision. While subject to intensive supervision and less than three years after his release from prison, defendant began an illegal sexual relationship with a minor, whom he impregnated. After serving his subsequent prison sentence, defendant again failed to comply with sex offender registry requirements. His resulting two-year prison sentence delayed his initial SBM hearing until he was again released. Since 1996, when not incarcerated, the longest period of time defendant has not committed a sex crime against a minor is the six years (from 2013 to the present) he has been enrolled in SBM. Thus, his underlying convictions for sexually violent offenses and subsequent actions contravene any as-applied argument, for defendant sits squarely within the class of aggravated and recidivist offenders the General Assembly intended to address.

IV. Facial Reasonableness of the Statute

A facial challenge maintains the statute "always operates unconstitutionally." *Facial Challenge, Black's Law Dictionary* (10th ed. 2014). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697, 707 (1987); *see also Patel*, 135 S. Ct. at 2449, 2451, 192 L. Ed. 2d at 443, 446 (majority opinion) (applying the *Salerno* standard to a Fourth Amendment facial challenge). In other words, to succeed in a facial challenge, defendant must shoulder the heavy burden of showing that the statute's SBM requirement could never be reasonably applied to any offender who falls within the statutorily defined categories. *See Patel*, 135 S. Ct. at 2451, 192 L. Ed. 2d at 445 ("[A] [party] must establish that a 'law is unconstitutional in all of its applications.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190, 170 L. Ed. 2d 151, 160 (2008))). In the present case, defendant therefore must prove a statute could never constitutionally require enrollment of a defendant in lifetime SBM whose conduct meets the statutory definition of a recidivist. In other words, to support its holding, the majority must show that lifetime SBM is unreasonable for the most heinous crimes that meet the statutory requirements of recidivists and determine if SBM is unreasonable as to every defendant who committed those crimes.

Even though, as discussed, defendant's history of repeated sexual assaults on children places him squarely within the class of those identified by the legislature as requiring SBM to deter their behavior, defendant's behavior here does not encompass all possible scenarios in which the lifetime SBM statute may apply to recidivists. To support its holding, the majority must show that lifetime SBM is unreasonable for everyone who meets the recidivist classification in all circumstances, including the worst violent offenders. Of note, the United States Supreme Court has upheld civil commitment statutes targeting some of these sexually violent predators. *See Kansas v. Hendricks*, 521 U.S. 346, 350, 117 S. Ct. 2072, 2076, 138 L. Ed. 2d 501, 508 (1997). Thus, the balancing test must include the incremental impact on reasonable privacy interests of those for whom civil commitment may be available.

Under both *Samson*'s test for individuals with diminished expectations of privacy and *Vernonia*'s special needs doctrine, the lifetime SBM statute is facially constitutional. A Seventh Circuit panel applied the mandate provided by the United States Supreme Court in *Grady* to an SBM statute "functionally identical to" North Carolina's statute. *Belleau v. Wall*, 811 F.3d 929, 939 (7th Cir. 2016) (Flaum, J., concurring). The court held, *inter alia*, that lifetime SBM constituted a reasonable search under *Grady*. *Id.* at 936–37 (majority opinion).

Belleau was a sexually violent predator recently released from civil commitment. *Id.* at 931. The court first noted Belleau's privacy interests were "severely curtailed as a result of his criminal activities" even though he was not on

parole or probation because "persons who have demonstrated a compulsion to commit very serious crimes . . . must expect to have a diminished right of privacy as a result of the risk of their recidivating—and . . . the only expectation of privacy that the law is required to honor is an 'expectation . . . that society is prepared to recognize as reasonable.' " *Id.* at 935 (third alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516, 19 L. Ed. 2d 576, 588 (1967) (Harlan, J., concurring)). The majority discussed at length the dangers and underreporting of child sexual assaults as well as the high rates of recidivism among convicted sex offenders. *Id.* at 932–34. Thus, the court concluded the "*incremental* effect of the challenged statute" on Belleau's privacy was "slight," and the search was reasonable under the Fourth Amendment. *Id.* at 934–35, 936–37.

In a concurring opinion, Judge Flaum likewise concluded that the lifetime SBM statute did not violate the Fourth Amendment. In doing so he examined "two threads of Fourth Amendment case law: searches of individuals with diminished expectation of privacy [as in *Samson*] . . . and 'special needs' searches [as in *Vernonia*]." *Id.* at 939 (Flaum, J., concurring). Because the monitoring program's primary purpose was to reduce recidivism, Judge Flaum determined the program served a valid special need; nevertheless, a complete analysis of the search also must balance the public interest and the intrusion on reasonable privacy interests in a context-specific inquiry. *Id.* at 939–40. Judge Flaum first recognized the government's strong interest in protecting juveniles from sex offenders. *Id.* at 940 (citing *Lile*, 536 U.S. at 32–33, 122 S. Ct. at

2024, 153 L. Ed. 2d at 56–57 (plurality opinion)). While acknowledging the significant privacy interest at issue, *id.* (citing *Riley v. California,* 573 U.S. 373, 396, 134 S. Ct. 2473, 2490, 189 L. Ed. 2d 430, 447–48 (2014)), he opined that "the weight of this privacy interest [was] somewhat reduced by Belleau's diminished expectation of privacy. . . . [because] a felon's expectation of privacy lies somewhere in-between that of a parolee or probationer and an ordinary citizen," *id.* at 940–41 (citations omitted). Judge Flaum concluded that because the intrusion upon this diminished privacy was "relatively limited in its scope" when compared with the State's purpose, the SBM statute constituted a reasonable Fourth Amendment search. *Id.* at 941.

Here, as did the trial court, I agree with the reasoning of the Seventh Circuit and would hold North Carolina's SBM program effects a reasonable search. First, lifetime SBM enrollees have reduced privacy expectations given the nature of their acts and the resulting convictions. Second, the incremental intrusion upon this reduced privacy is slight. Third, the State's interest in, and its special need for, deterring recidivist violent sex offenders is paramount. Finally, this governmental interest outweighs the intrusion upon an SBM enrollee's diminished expectation of privacy in a context-specific balancing test that considers the totality of the circumstances.

The Seventh Circuit's analysis is persuasive here because, for all considerations relevant to a Fourth Amendment analysis, the Wisconsin SBM statute is "functionally identical to" the North Carolina SBM statute. *Id.* at 939. Both

statutes require continuous lifetime SBM for a categorically defined group of convicted sex offenders. *See* N.C.G.S. § 14-208.40; Wis. Stat. Ann. § 301.48(2) (West 2019). The civil SBM programs may apply to unsupervised offenders after they have completed parole, probation, or civil commitment. *See Belleau*, 811 F.3d at 932 (majority opinion) (recognizing that the offender was "not on bail, parole, probation, or supervised release"); *State v. Grady*, 817 S.E.2d 18, 24 (N.C. Ct. App. 2018) ("Unsupervised offenders . . . are statutorily required to submit to SBM . . . ."). Moreover, in one notable difference, the Wisconsin statute prohibits certain offenders from ever requesting termination of lifetime SBM and does not allow any offender to petition for termination for at least twenty years, but the North Carolina statute allows a person to apply for termination of "lifetime" SBM beginning one year following the offender's release from prison and completion of any post-release supervision. *Compare* Wis. Stat. Ann. § 301.48(6)(b)(2), (3), *with* N.C.G.S. § 14-208.43(a).

An analysis of facial constitutionality starts with defining the scope of the privacy interests involved. "[I]t is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony." *State v. Bowditch*, 364 N.C. 335, 349–50, 700 S.E.2d 1, 11 (2010) (citations omitted); *see also Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391, 132 L. Ed. 2d at 575 ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the

individual's legal relationship with the State."). Because of their own conduct and propensities that led to their underlying convictions and statutory classifications, felony sex offenders face a plethora of rights restrictions, specifically a reduction in their Fourth Amendment privacy expectations "that society recognizes as 'legitimate.' " *Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2390–91, 132 L. Ed. 2d at 575 (quoting *T.L.O.*, 469 U.S. at 338, 105 S. Ct. at 741, 83 L. Ed. 2d at 732).

For example, restrictions on firearms possession and voting rights evince a felon's reduced constitutional protections. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 2816–17, 171 L. Ed. 2d 637, 678 (2008) (affirming that the "longstanding prohibitions on the possession of firearms by felons" survive Second Amendment scrutiny); *Richardson v. Ramirez*, 418 U.S. 24, 56, 94 S. Ct. 2655, 2671, 41 L. Ed. 2d 551, 572 (1974) (holding that disenfranchisement of convicted felons who had completed their sentences did not violate the Equal Protection Clause). Furthermore, the sex offender registration requirements of all fifty states manifest a diminished expectation of privacy for sex offenders. *Cf. Smith*, 538 U.S. at 89–90, 123 S. Ct. at 1145, 155 L. Ed. 2d at 174–75. Society clearly does not afford violent sex offenders a full legitimate expectation of location-based privacy, as exemplified by the limitations on sex offenders' movements. *See* N.C.G.S. § 14-208.18(a)(1), (4) (2017) (prohibiting sex offenders from being present at "any place intended primarily for the use, care, or supervision of minors, including, but not limited to, schools, children's museums, child care centers, nurseries, and playgrounds," as well as the State Fair);

*Standley v. Town of Woodfin*, 362 N.C. 328, 333, 661 S.E.2d 728, 732 (2008) (upholding prohibition on convicted sex offenders entering public parks). Felony sex offenders may also be barred from certain occupations and professions, a harsh sanction that limits them from choosing where they work and what type of livelihood they may pursue. *E.g.*, N.C.G.S. § 84-28(b)(1), (c) (2017) (attorney); *id.* § 90-14(a)(7), (c) (2017) (medical doctor); *id.* § 93-12(9)(a) (2017) (certified public accountant); *id.* § 93A-6(b)(2) (2017) (real estate broker). Thus, while recidivist sex offenders have a somewhat greater expectation of privacy than a probationer or parolee, they do not have the same expectations of privacy as members of the general public in light of their prior offenses.[5,6] *See Belleau*, 811 F.3d at 934–35 (majority opinion) ("Focus[ing]

---

[5] The majority asserts that "except as reduced for possessing firearms and by providing certain specific information and materials to the sex offender registry, defendant's constitutional privacy rights, including his Fourth Amendment expectations of privacy, have been restored." The majority's logic is backwards. Defendant's expectation of privacy is not reduced "by" the sex offender registry; rather, the sex offender registry may require defendant to provide information *because* his privacy rights are reduced. The majority offers no explanation for why the scope of diminished privacy expectations is restricted to only those reductions implicated by firearm possession and the sex offender registry. Rather, the actual issue is what reductions in reasonable expectations of privacy does society recognize as legitimate for recidivist violent sex offenders. *See Vernonia*, 515 U.S. at 654, 115 S. Ct. at 2391, 132 L. Ed. 2d at 575 (quoting *T.L.O.*, 469 U.S. at 338, 105 S. Ct. at 741, 83 L. Ed. 2d at 732).

[6] In *Carpenter v. United States*, the Supreme Court held that, for citizens without a reduced expectation of privacy, government tracking of a suspect's location without a warrant substantially intrudes upon reasonable privacy rights. 138 S. Ct. 2206, 2217, 201 L. Ed. 2d 507, 521 (2018). There the police acquired the defendant's cell site location information (CSLI) containing the time-stamped locations of his cell phone for an extended period of time. *See id.* at 2217, 2220, 201 L. Ed. 2d at 521, 525 (narrowly limiting the holding to "legitimate expectation[s] of privacy in the record of [the defendant's] physical movements as captured through CSLI"). The Court expressed concern that allowing police to surreptitiously invade

. . . on the *incremental* effect of the challenged statute on . . . privacy . . . [reveals that the] effect is slight" in the context of a convicted violent sex offender's diminished expectation of privacy); *see also Samson*, 547 U.S. at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259 (finding no intrusion upon a parolee's diminished expectation of privacy); *Vernonia,* 515 U.S. at 658, 115 S. Ct. at 2393, 132 L. Ed. 2d at 577 (concluding the intrusion upon privacy was "negligible" in light of student athlete's reduced expectation of privacy at school).

First, the physical limitations imposed by SBM are "more inconvenient than intrusive" and do not materially invade defendant's diminished privacy expectations. *Grady*, 817 S.E.2d at 25. As noted by the trial court, the ankle monitor weighs less than nine ounces, and it "does not prohibit any defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes." Charging the monitor takes at most two hours per day, which poses an insignificant burden

---

reasonable expectations in this manner would expose an expansive class of individuals (i.e., anyone with a cell phone) to unfettered government surveillance. *See id.* at 2218, 201 L. Ed. 2d at 522 ("Only the few without cell phones could escape this tireless and absolute surveillance."). Here those concerns are not present. Lifetime SBM only applies to a narrow, statutorily defined class of convicted sex offenders. The police have no discretion over who is searched, and thus the SBM program does not raise the same concerns of arbitrary, universal tracking at issue in *Carpenter. See id.* at 2213, 201 L. Ed. 2d at 517 ("The basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (internal quotation marks and citation omitted)); *see also id.* at 2214, 201 L. Ed. 2d at 518 ("[A] central aim of the Framers was to place obstacles in the way of too permeating police surveillance." (internal quotation marks and citation omitted)).

considering the ubiquity of other personal electronic devices the average person charges every day.

Second, regarding the effect on other privacy interests, SBM falls on a spectrum of possible "regulatory schemes that address the recidivist tendencies of convicted sex offenders." *Bowditch*, 364 N.C. at 341, 700 S.E.2d at 6. At one end of the continuum, civil commitment involves a highly invasive affirmative restraint and deprivation of rights similar to imprisonment. *See Hendricks,* 521 U.S. at 350, 117 S. Ct. at 2076, 138 L. Ed. 2d at 508; *Belleau,* 811 F.3d at 932. Next, career and travel limitations significantly restrict the exercise of fundamental freedoms. Finally, on the other end of the sex offender civil regulatory spectrum, registration statutes impose the fewest restrictions on a defendant's liberty, yet they still require the offender to provide certain information to law enforcement and the public. *See* N.C.G.S. § 14-208.10 (2017).

At the urging of Congress, every state has adopted a sex offender registration act that requires collection, maintenance, and distribution of information about the registered sex offender and imposes penalties for noncompliance. *E.g.*, N.C.G.S. § 14-208.7 (2017). *See generally Smith*, 538 U.S. at 89–90, 123 S. Ct. at 1145, 155 L. Ed. 2d at 174–75. The purposes of sex offender registration are to provide notification to the community and deter future sex offenses. *See Smith*, 538 U.S. at 102–03, 123 S. Ct. at 1152, 155 L. Ed. 2d at 183. When registering, a sex offender must provide his full name, any aliases, date of birth, sex, race, height, weight, eye

color, hair color, driver's license number, home address, the type of offense, the date of conviction, the sentence imposed, a current photograph, fingerprints, and any online identifiers (such as social media usernames). N.C.G.S. § 14-208.7(b). Every six months, the sex offender must verify that his registration information has not changed, and the registrant must provide timely updates regarding any change of address or name, enrollment status in school, or online identifiers. *Id.* §§ 14-208.9, -208.9A (2017). Moreover, the sex offender's name, sex, address, physical description, picture, conviction dates, offenses, sentences imposed, and registration status are publicly available, and "[t]he sheriff shall release any other relevant information that is necessary to protect the public concerning a specific person." *Id.* § 14-208.10. Ten years after registering, a sex offender may petition to terminate his registration. *Id.* § 14-208.12A (2017).

Thus, along the spectrum of possible regulatory schemes, SBM's privacy intrusion is most similar to sex offender registration. Both programs mandate disclosing information to the State that is not ordinarily required for the general public. Both protect the public through deterrence. Both allow for termination, SBM after one year and registration after ten years. In contrast with the other options, "[t]he SBM program does not detain an offender [or resemble imprisonment] in any significant way." *Bowditch*, 364 N.C. at 349, 700 S.E.2d at 11. Additionally, "[t]he monitoring taking place in the SBM program is far more passive and is distinguishable from the type of State supervision imposed on probationers," and

"[o]ccupational debarment is far more harsh than an SBM program." *Id.* at 346, 349, 700 S.E.2d at 9–10; *see also Doe v. Bredesen,* 507 F.3d 998, 1005 (6th Cir. 2007) (citing *Smith,* 538 U.S. at 100, 123 S. Ct. at 1151, 155 L. Ed. 2d at 181) (noting SBM is less harsh than occupational debarment), *cert. denied,* 555 U.S. 921, 129 S. Ct. 287, 172 L. Ed. 2d 210 (2008).

Accordingly, in the totality of the circumstances, SBM that provides information regarding physical location and movements effects a small, incremental intrusion in the context of the diminished expectation of privacy that society would recognize as legitimate. SBM does not prevent a defendant from going anywhere he is otherwise allowed to go. The tracking mechanism only passively collects location data; as the trial court found, "[T]he ankle monitor does not monitor or reveal the activities of the offender—it merely monitors his location." *See also Belleau*, 811 F.3d at 936 ("It's untrue that 'the GPS device burdens liberty . . . by its continuous surveillance of the offender's activities'; it just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations." (alteration in original) (quoting *Commonwealth v. Cory*, 454 Mass. 559, 570, 911 N.E.2d 187, 196 (2009))). Where a defendant is unsupervised, no one regularly monitors the defendant's location, significantly lessening the degree of intrusion. *See id.* at 941 (Flaum, J., concurring). Furthermore, though the program is referred to as "lifetime" monitoring, a defendant may petition to be removed from SBM after one year. N.C.G.S. § 14-208.43 (permitting termination if a defendant shows he has not been

convicted of any additional qualifying convictions, has substantially complied with the SBM program, and "is not likely to pose a threat to the safety of others"). Therefore, in the context of diminished privacy expectations, SBM's degree of intrusion is minimal.

On the other hand, regarding "the public interest, in this case, the state's interest can hardly be overstated." *Belleau*, 811 F.3d at 940. The General Assembly has "recognize[d] that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest." N.C.G.S. § 14-208.5. More specifically, "[t]he General Assembly also recognizes . . . that the protection of [sexually abused] children is of great governmental interest." *Id.* This finding is supported by United States Supreme Court precedent, congressional action, the public policy of all fifty states, and "the moral instincts of a decent people." *Packingham*, 137 S. Ct. at 1736, 198 L. Ed. 2d at 281; *see* 34 U.S.C.A. § 20981; *Conn. Dep't of Pub. Safety*, 538 U.S. at 4, 123 S. Ct. at 1163, 155 L. Ed. 2d at 103; *Smith*, 538 U.S. at 89–90, 123 S. Ct. at 1145, 155 L. Ed. 2d at 174–75.[7] Therefore, requiring enrollment in SBM accomplishes the General Assembly's

---

[7] When presented with conflicting evidence supporting the legislature's public policy determinations, courts should defer to the legislature's findings of fact, especially where, like here, that determination is overwhelmingly corroborated. Additionally, the trial court considered "multiple studies of recidivism rates of sex offenders versus other criminals" and found the search reasonable in light of this evidence.

purpose of protecting the public by deterring violent sex offenders from committing further sex crimes, thereby "promot[ing] . . . legitimate governmental interests." *Samson*, 547 U.S. at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256 (quoting *Knights*, 534 U.S. at 119, 122 S. Ct. at 591, 151 L. Ed. 2d at 505).[8]

Finally, the paramount governmental interest outweighs the minimal intrusion upon diminished privacy interests when considering the totality of possible circumstances that may arise under the statute. Here the facially challenged statutes reasonably provide for lifetime SBM for the worst recidivist sexual offenders, and lifetime SBM is significantly less invasive than civil commitment or other regulatory options available for those offenders. The majority, however, putting itself in the place of the legislature, would draft a statute excluding sexually violent recidivists from mandatory lifetime SBM, yet the case law is clear that courts should not assume

---

[8] "[I]t is undisputed that the [SBM] law promotes deterrence . . . . [which] appears to be the primary purpose of the law." *Belleau*, 811 F.3d at 943; *accord Bredesen*, 507 F.3d at 1007. Moreover, the efficacy of SBM as a deterrent is self-evident: The search "deter[s] future offenses by making the plaintiff aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present." *Belleau*, 811 F.3d at 935 (majority opinion); *see also Vernonia*, 515 U.S. at 663, 115 S. Ct. at 2395–96, 132 L. Ed. 2d at 581 (remarking that the "efficacy" of the search was "self-evident" where the goal was to deter drug use by athletes and the school promulgated the drug-testing policy so that athletes would know they would be tested); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 629–30, 109 S. Ct. 1402, 1420, 103 L. Ed. 2d 639, 668 (1989) (recognizing that it is "common sense" that employees must "know they will be tested" for drugs and alcohol in order to deter substance abuse). Thus, there is no need for individualized inquiries into the efficacy of deterring a particular defendant, nor is the State required to prove this common sense principle with empirical evidence. Nonetheless, since 1996, when not incarcerated, the longest period of time defendant has not committed a sex crime against a minor is the six years he has been subject to SBM.

the role of the legislature when the legislative categories are reasonable. *See, e.g., Smith*, 538 U.S. at 103–04, 123 S. Ct. at 1153, 155 L. Ed. 2d at 184 ("[Where] [t]he legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class[,] . . . . [a State is] not preclude[d] . . . from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."); *Bredesen*, 507 F.3d at 1007 ("[O]ur role is not to invalidate the [SBM] program if the . . . Legislature has not struck the perfect balance between the regulatory purpose of the program and its burdens on [our] citizens, but rather to determine whether the means chosen are reasonable."). The majority expresses concern that "[a] wide range of different offenses are swept into" the statute's definition of recidivist, but if the statute is ever overbroadly applied to a defendant, he can bring an as-applied challenge that takes into account his specific convictions, circumstances, and facts. *See Britt*, 363 N.C. at 549–50, 681 S.E.2d at 322–23.

Moreover, the majority's sweeping analysis jeopardizes most applications of the lifetime SBM statute. Despite the majority's strenuous insistence that its reasoning only addresses lifetime SBM for recidivists without affecting lifetime SBM for sexually violent predators, aggravated offenders, and adults who otherwise sexually victimize children under thirteen years old, the facts, analysis, and ultimate outcome of this case demonstrate otherwise. The majority's approach is devoid of any discussion as to why SBM is unconstitutional for the worst crimes that would place a

defendant in the statutory category of recidivist. Further, by upholding the reversal, without remand of the trial court's order requiring lifetime SBM, the majority's disposition does not effect the result it claims in its reasoning. Rather, affirming the Court of Appeal's reversal removes defendant, whose convictions satisfy the statutory definition for an aggravated offender, from the lifetime SBM program without directing the trial court to determine whether he qualifies for lifetime SBM as an aggravated offender. This decision would seem to prevent lifetime SBM for a defendant who is a recidivist but also qualifies for lifetime SBM under a different statutory subsection.[9] Thus, not only does the majority's facial analysis fail to consider all possible scenarios in which the lifetime SBM statute may apply to recidivists, but it also does not address the specific result of its holding on defendant here. Because the statute requiring lifetime SBM can be constitutionally applied to sexually violent recidivists, such as defendant, defendant's facial challenge should fail.

V. Special Needs Search[10]

---

[9] Notably, the trial court could not alternatively enroll a recidivist defendant in SBM for a term of years either. N.C.G.S. § 14-208.40A(d).

[10] Because defendant has a reduced expectation of privacy, the special needs doctrine does not apply here. *See Maryland v. King*, 569 U.S. 435, 463, 133 S. Ct. 1958, 1978, 186 L. Ed. 2d 1, 30 (2013) ("The special needs cases . . . do not have a direct bearing on the issues presented in this case, because unlike the search of a citizen who has not been suspected of a wrong, [the defendant] has a reduced expectation of privacy."); *Samson*, 547 U.S. at 852 n.3, 126 S. Ct. at 2199 n.3, 165 L. Ed. 2d at 259 n.3 ("[W]e [do not] address whether . . . [the]

Lastly, the SBM program serves a "special need[ ], beyond the normal need for law enforcement, [that] make[s] the warrant and probable-cause requirement impracticable." *Vernonia*, 515 U.S. at 653, 115 S. Ct. at 2391, 132 L. Ed. 2d at 574 (quoting *Griffin*, 483 U.S. at 873, 107 S. Ct. at 3168, 97 L. Ed. 2d at 717). The special needs doctrine does not apply where "the primary purpose of the . . . program is to uncover evidence of ordinary criminal wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42, 121 S. Ct. 447, 454, 148 L. Ed. 2d 333, 343 (2000), but conversely, "a program satisfies a special need if the program 'is not undertaken for the investigation of a specific crime,' " *Belleau*, 811 F.3d at 940 (quoting *Green v. Berge*, 354 F.3d 675, 678 (7th Cir. 2004)). " '[S]pecial needs' have been found 'not because the rules [for warrants and probable cause] are inconvenient to follow,' but rather 'because in such situations, the rules are not needed to prevent the mischief that [warrants] are designed to prevent.' " *United States v. Amerson*, 483 F.3d 73, 82 (2d Cir. 2007) (second alteration in original) (quoting *Nicholas v. Goord*, 430 F.3d 652, 680 (2d Cir. 2005) (Lynch, J., concurring), *cert. denied*, 549 U.S. 953, 127 S. Ct. 384, 166 L. Ed. 2d 270 (2006)), *cert. denied*, 552 U.S. 1042, 128 S. Ct. 646, 169 L. Ed. 2d 515 (2007). "The need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral

---

search . . . is justified as a special need . . . because our holding under general Fourth Amendment principles renders such an examination unnecessary."). Nevertheless, in accordance with the Supreme Court's mandate and in response to the majority opinion, I discuss the application of the special needs doctrine *arguendo*.

magistrate between the citizen and the law enforcement officer.' " *Maryland v. King*, 569 U.S. 435, 447, 133 S. Ct. 1958, 1969–70, 186 L. Ed. 2d 1, 20 (2013) (alteration in original) (quoting *Nat'l Treasury Emps. Union v. Von Raab,* 489 U.S. 656, 667, 109 S. Ct. 1384, 1391, 103 L. Ed. 2d 685, 703 (1989)); *see also Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979) (remarking that the Fourth Amendment's purpose "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials" (footnote omitted)).

Thus, case law recognizes that the government's interest in deterring at-risk individuals from activity detrimental to public safety is a special need when the search does not constitute an investigation of a specific crime and does not involve the exercise of discretion by law enforcement officers. *See Vernonia*, 515 U.S. at 658 n.2, 115 S. Ct. at 2393 n.2, 132 L. Ed. 2d at 578 n.2 (distinguishing the "prophylactic and distinctly *non*punitive purposes (protecting student athletes from injury, and deterring drug use in the student population)" of the programmatic search effected by drug testing from " 'evidentiary' searches, which generally require probable cause"); *see also Von Raab,* 489 U.S. at 666, 109 S. Ct. at 1391, 103 L. Ed. 2d at 702 (upholding a drug-screening program "to deter drug use" among certain United States Customs Service employees as a special needs search); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 632–33, 109 S. Ct. 1402, 1421–22, 103 L. Ed. 2d 639, 670 (1989) (finding that, because a drug-screening program for railroad employees was "designed not only to discern [drug and alcohol] impairment but also to deter it," the

search was a special needs search that furthered the government's interest in deterring "hazardous conduct" that puts the public at risk).

Here the SBM program's primary purpose is to serve the special need of "protecting the public against recidivist tendencies of convicted sex offenders." *Bowditch*, 364 N.C. at 351, 700 S.E.2d at 12 (recognizing deterrence as a purpose and effect of SBM). Because "there is no specific crime to give rise to probable cause," the search effected by the SBM program is not predicated on the judgment or discretion of law enforcement or any other government official, and "[a]ccordingly, the traditional safeguards of the Fourth Amendment, such as the warrant requirement, are unworkable." *Belleau*, 811 F.3d at 941.[11] Thus, the SBM program is constitutional pursuant to the special needs doctrine.

## VI. Conclusion

"Although privacy is a value of constitutional magnitude, it must yield, on occasion, to the state's substantial interest to protect the public through reasonable regulations in appropriate circumstances. This case presents one of those circumstances." *Belleau*, 811 F.3d at 939. The search arising from the SBM statute

---

[11] As a secondary benefit, the program creates a repository of information that law enforcement may use to detect or preclude the enrollee's involvement in future sex offenses. While the "[i]nformation gathered from this program may, at some later time, be used as evidence in a criminal prosecution, . . . the program is setup [sic] to obviate the likelihood of such prosecutions" and, therefore, still falls within the scope of the special needs doctrine. *Belleau*, 811 F.3d at 940. Furthermore, the collection of this information provides the deterrent effect.

for a limited category of high-risk recidivist sex offenders, given the totality of the circumstances, is a reasonable search under the Fourth Amendment. The purpose of the SBM program in protecting the public from sex crimes is of paramount importance. As demonstrated by several other constitutionally sound regulations designed to protect the public from sex offenders, defendant's reasonable expectation of privacy is significantly diminished because of his multiple child sex offenses. Given his diminished privacy expectations, the incremental nature of the search providing location information and the method of data collection via an ankle bracelet are more inconvenient than intrusive. While courts must continue to "approach the government's use of [GPS technology] with caution, to ensure that it does not upset the balance of rights bestowed by the Constitution," *id.* at 938–39, the SBM search here is reasonable, and the statute is constitutional. The decision of the Court of Appeals should be reversed and the trial court's SBM order reinstated. Accordingly, I respectfully dissent.

Justice MORGAN joins in this dissenting opinion.